NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0492-11T4
           A-1593-12T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ROLANDO TERRELL,

    Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**NOVEMBER 29, 2017**

**APPELLATE DIVISION**

Submitted September 17, 2015 - Decided May 3, 2016

Before Judges Lihotz, Fasciale and Higbee.

On appeal from Superior Court of New Jersey,
Law Division, Essex County, Indictment Nos.
09-07-2029 and 09-07-2032.

Joseph E. Krakora, Public Defender, attorney
for appellant (Alison S. Perrone, Designated
Counsel, on the brief).

Carolyn A. Murray, Acting Essex County
Prosecutor, attorney for respondent (Lucille
M. Rosano, Special Deputy Attorney General/
Acting Assistant Prosecutor, on the brief).

PER CURIAM

    Defendant Rolando Terrell appeals from convictions under
two indictments.  The first, Indictment No. 09-07-2029, charged
him with numerous crimes regarding the September 8, 2008 arson,
robbery, and murders of four victims.  Co-defendant Lester Hayes

was charged in the first fifteen counts of this indictment.[1] The second, Indictment No. 09-07-2032, charged defendant with the single count of second-degree possession of a weapon by a certain persons not to possess weapons, N.J.S.A. 2C:39-7(b).

During defendant's trial, Hayes, who pled guilty pursuant to a negotiated plea agreement, testified on behalf of the State as to the events underlying the charges against defendant. Following trial, a jury acquitted defendant of some crimes, convicted him of others, and hung on the counts charging murder and one weapons offense. Immediately thereafter, a second trial was held, limited to the certain persons offense in the separate indictment; the jury found defendant guilty. Defendant was then sentenced. Defendant appealed from the final judgment of

---

[1] An Essex County Grand Jury charged defendant, under Indictment No. 09-07-2029, with: second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 (count one); two counts of first-degree robbery, N.J.S.A. 2C:15-1 (counts two and three); four counts of first-degree knowing and/or purposeful murder, N.J.S.A. 2C:11-3(a)(1) and (2) (counts four, five, six and seven); four counts of first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (counts eight, nine, ten and eleven); second-degree unlawful possession of a handgun on September 8, 2008, N.J.S.A. 2C:39-5(b) (count twelve); second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count thirteen); second-degree conspiracy to commit aggravated arson, N.J.S.A. 2C:5-2 and 2C:17-1(a)(1) and (2) (count fourteen); second-degree aggravated arson, N.J.S.A. 2C:17-1(a)(1) and (2) (count fifteen); third-degree defacing a handgun, N.J.S.A. 2C:39-9(e) (count sixteen); and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count seventeen). Count seventeen was severed at trial.

conviction and argued the sentence imposed was excessive. His challenges are presented under Docket No. A-0492-11.

While this appeal was pending, the State retried defendant on the murder and weapons defacement charges. Defendant was convicted of the four murder charges and acquitted of the weapons charge. Defendant appeals from the convictions and the sentences imposed for these crimes. The challenges raised are presented under Docket No. A-1593-12.

We calendared the matters back-to-back and address the issues raised in both appeals in one opinion. Following our review of the arguments, in light of the record and applicable law, we affirm.

I.

These facts are taken from the trial records. Initially, we recite the facts leading to defendant's indictment, followed by the results of the trial and retrial. Next, we separately discuss defendant's arguments challenging his convictions. Additional facts specific to defendant's arguments raised on appeal will be included in the discussion of each argument.

A.

Michael Fields, his daughter, his girlfriend (Fields' girlfriend), her daughters and grandchild lived at a residence on Columbia Avenue in Irvington. Fields, an avowed member of a

gang, was a drug dealer and worked with gang associates James Williams and Kevin Wigfall. Fields openly stated he kept drugs and sales proceeds in his home.

Although Fields was imprisoned, he remained in contact with his girlfriend, Williams and Wigfall. Fields also knew defendant. Five days prior to the September 8, 2008 murders, Fields called his home and defendant answered the phone.

Other witnesses confirmed defendant visited the Columbia Avenue residence prior to the murders and fire. One resident of the home (the survivor) testified regarding defendant's visit in early August, accompanied by Williams and Wigfall, and again approximately two weeks before the murders. During this latter meeting Fields' girlfriend, the survivor, and defendant sat in a 1997 red Jeep Grand Cherokee. Defendant questioned Fields' girlfriend, who related a threatening telephone call she received and stated she was considering moving.

On the morning of September 8, 2008, Hayes was waiting at a bus stop when defendant, driving a red Jeep, stopped and motioned him to get in the vehicle. Hayes knew defendant from prison and believed defendant was offering him a ride to his mother's home. Once in the vehicle, defendant told Hayes, "we getting [sic] ready to go do this robbery now." Hayes told defendant he was not interested, but defendant replied, "Nah, we

getting [sic] ready to do it right now."  Hayes understood he was to accompany defendant.

The pair drove to and parked across the street from the Columbia Avenue apartment.  Defendant told Hayes he intended to rob the home, admitting he knew "the girl that lives [t]here," and knew her boyfriend was in prison.  Defendant stated: "Everything is going to be all right, Mu.  You know, we going to go in here [sic], and get this money, and get this shit, and come out, and it's going to be real easy."

Defendant handed Hayes an empty Corona bottle.  Next, he retrieved a gas container from the rear of the Jeep, took the bottle, filled it with liquid, put a sock around the top and handed the filled beer bottle back to Hayes.  Defendant also showed Hayes a loaded black automatic handgun.

The pair exited the Jeep and headed to Fields' girlfriend's apartment.  As defendant followed Hayes up the stairs, he placed the beer bottle in Hayes' back pocket and covered the bottle with Hayes' shirt.  Fields' girlfriend answered the door and recognized defendant.  Defendant introduced Hayes as "Uncle Mu" and Fields' girlfriend allowed them to enter.  Once inside, Hayes described defendant's interaction with Fields' girlfriend this way:

> [Defendant] turned and asked, you know,
> like, "Is everything still all right in

> here," you know, inquiring about, you know, where's the drugs at, and stuff, if they're still here, and that's when it took a turn, because she was like, "Nah, they came and got it last night, yesterday," or whatever, and he was like, "Nah, it's still here," like, he knew it was still in the house, and she was trying to tell him, like, no, it wasn't in there, and they . . . kept going back and forth, and he's, like, "I know it's in here," and she's like, "Nah, nah, it's not in here, it's not in here."

Fields' girlfriend became hysterical and defendant grew more aggressive and insistent drugs were in the home. As the argument continued, defendant "reached behind him and pulled the gun out, and put it on her neck, and was like, 'I know it's in here. Bitch, I know it's in here.'" Hayes explained defendant continued to push Fields' girlfriend and hold the gun at her neck, demanding she turn over the drugs.

> [A]ll of a sudden . . . [w]hen [defendant] pushed her for the last time, she backed up, and reached and grabbed something, like a little bag, like a billfold or something like that, and said, "Here, take it." She threw — she must have threw [sic] it at him, because it bounced, and it hit him, and it fell, and it was a little — some money. It just hit the floor.

Defendant retrieved the object.

Hayes believed defendant obtained what he wanted and moved to exit the residence. Defendant grabbed the beer bottle from Hayes' rear pocket. Hayes heard defendant say he was "tired of you bitches." He turned and saw defendant pull the sock from

6

the bottle and splash its contents throughout the room. As Hayes left the house he heard a gunshot. He walked across the street and recalled hearing a total of four or five gunshots. When he saw defendant exit, Hayes saw smoke coming from the windows of the home.

The survivor, who had described the earlier meeting held in the Jeep with defendant and Fields' girlfriend, awoke and heard a man's voice saying "'Where's it at? Where's it at? You know what I'm looking for.'" She told police she heard only one male voice, which "wasn't old, and it wasn't young," perhaps belonging to someone in his twenties or thirties. She described the voice as "anxious," and sounded like the man "was stopped up, like he had a cold." When interviewed that day, she believed the voice was familiar but she was unable to identify the person; she believed she could identify the voice if she heard it again because she heard the man talking throughout the incident.

During the altercation, the survivor hid in her closet and attempted to call for help.[2] When she first tried to escape, she stopped after she heard the front door close. However, when smoke alarms sounded and smoke from the living room filled the

_____

[2]    The initial 9-1-1 call was disconnected and repeated calls were made, all of which were played for the jury.

apartment, she grabbed her young nephew, ran out the back door and began screaming for help.

As Hayes stood across the street, he saw defendant leave the apartment and enter the Jeep. Defendant picked up Hayes and the two drove toward East Orange. Defendant told Hayes, "'I don't need no codefendants, Mu.'" Defendant told Hayes he wanted to go to Brooklyn, New York. Hayes agreed to get him there. As they drove, defendant pointed to a tattoo on his neck and Hayes knew defendant was a gang member. Defendant told Hayes: "'Yeah, Mu, I love this shit right here, I'd die for it,'" which Hayes realized meant he "couldn't tell on him, because he was part of the . . . gang, and they'll come get me if I did, you know, 'cause they — they're a vicious group . . . ." Hayes testified he felt nervous, but did not want defendant to suspect he might inform authorities. While stopped in traffic, defendant told Hayes to toss the near empty Corona bottle from the Jeep window; defendant also threw out the sock.

During the drive, Hayes received several calls from his girlfriend. For defendant's benefit, he pretended the calls were from his mother and informed defendant he was late, as he promised his mother he would help her get to work. To avoid revealing his home address, Hayes asked defendant to stop at a location other than his residence. As he exited the Jeep,

defendant handed Hayes $200, repeating: "'You know, I don't need no codefendants now.'" Hayes took the money "so . . . it wouldn't look like, you know, like, I would tell on him or anything." Hayes assured defendant: "'Yeah, all right, Man, I'll see you later . . . .'"

The next day, after consulting with his attorney, Hayes voluntarily surrendered to police. He did not know defendant's name, but described him and chose defendant's photograph from an array. He also made an in-court identification.

The State also presented evidence from neighbors. One, who was across the street, heard two gunshots and observed "two or three" Afro-American men running from a residence and enter a red "truck."[3] The witness reported the fire located in the house across the street from where the red vehicle was parked. The following day, the witness was interviewed by police and chose defendant's photograph from an array, identifying him as one of the men observed running from the house after gunshots were heard. During trial, the witness made an in-court identification of defendant and also identified a photograph of the red Jeep, stating it was the "red truck" she saw parked on Columbia Avenue on September 8, 2008. On cross-examination, the

---

[3] The witness did not testify during defendant's retrial.

witness advised overhearing another neighbor refer to one of the men as "Mu."

A different neighbor described seeing an orange Jeep at 7 a.m. parked on Columbia Avenue on the morning of September 8, 2008, as he exited his driveway. The windows were tinted and he could tell only that someone was inside the vehicle.

Firefighters were dispatched between 7:40 and 7:50 a.m. Fields' girlfriend and another were dead, after being shot in the head; two others, although shot in the head, were alive; however, they later succumbed to their injuries.

On September 10, 2008, while relating the events to her boyfriend, the survivor suddenly realized she recognized the man's voice she heard on the morning of the shootings. The following day police brought her in for additional questioning. In a taped statement, she told police she was "a hundred percent positive that [she] knew who it was," naming defendant, whom she knew as "Unc." She was shown photographs and identified defendant's picture as "Unc." She also identified photographs of Williams and Wigfall. At trial, the survivor insisted she initially told police she could recognize the voice, but conceded that remark was not in her September 8, 2008 statement.

Essex County Prosecutor's Office Detective Christopher Smith testified regarding his involvement in law enforcement's

investigation, beginning on the morning of September 8, 2008. He confirmed he first spoke to the survivor that morning and she told him she recognized the voice, which was familiar, but was unable to identify the man. He also confirmed the survivor subsequently identified defendant as the one she heard screaming at Fields' girlfriend. Police obtained a search warrant for the Jeep and an arrest warrant for defendant. Defendant surrendered to police on September 13, 2008.

Detective Kenneth Dougherty was called by the State to testify regarding an unrelated Essex County Prosecutor's Office investigation conducted in conjunction with the Drug Enforcement Administration (DEA). Police monitored an authorized wiretap of the phone of Bengie Davis, who engaged in calls with defendant, Williams, and Wigfall, which implicated knowledge of or involvement in the murders.

Davis testified, prior to September 8, 2008, he met defendant in a Newark bar, where the two were drinking. When defendant began "acting out of control" and firing a gun in the air, Davis took the weapon and kept it at his residence. He described the weapon as a black nine-millimeter handgun with a red dot on its side. Davis said defendant "just kept calling me, harassing me for it," meaning his gun. Specifically, defendant called Davis on September 7, 2008, when Davis told him

he was "inpatient [sic] as hell." Defendant told Davis he was "meaning . . . to come through and get it," which Davis interpreted to mean defendant would be coming to get the gun. Davis confirmed defendant came to his apartment on September 7, 2008, and Davis returned the gun. Also, Davis identified defendant's voice in calls he received that were played for the jury.[4]

Davis further admitted he knew Williams and Wigfall and they were fellow gang members. He also knew defendant drove a Jeep Cherokee, which he believed was owned by Williams. Finally, he acknowledged he was testifying as a condition of a negotiated plea agreement resolving narcotics trafficking charges.

Police recovered an operable defaced Hi-Point nine-millimeter handgun from another person. Four spent shell casings recovered from Columbia Avenue were determined to have been fired from the handgun, confirming it was the murder

---

[4] Among the wiretapped recordings played for the jury were: (1) session 2050: a September 7, 2008 call at 10:03 p.m. from "a gentleman who referred to himself as Uncle Rat in one of the prior sessions, and . . . Davis"; (2) session 2051: a September 7, 2008 call at 10:05 p.m., between Davis and someone identifying himself as Uncle Rat; (3) session 2052: a September 7, 2008 call at 10:08 p.m. between Davis and someone identifying himself as Uncle Rat; (4) session 2057: a September 7, 2008 call at 10:24 p.m., between Davis and "Mizi," who was Williams; (5) session 2058: a September 7, 2008 call at 10:25 p.m., between Williams and Davis.

weapon.    Davis  testified  this  nine-millimeter  handgun  was  the same gun with the red dot he had taken from and later returned to defendant on September 7, 2008.

The State presented expert testimony regarding the fire, its origination and cause.  A forensic chemist, qualified as an expert  in  fire  debris  analysis,  identified  the  presence  of volatile substances on the victims' clothing, the clothing Hayes wore on September 8, 2008, and in the Jeep.  The State also called a street gang expert.

Defendant presented testimony from a private investigator, who had measured distances from the Columbia Avenue address to the testifying neighbor's homes.  Although a pretrial ruling permitted a defense expert to testify in specified areas regarding the accuracy and reliability of voice identification evidence, defendant called no other witnesses and offered no documents.

On April 12, 2011, the jury rendered its verdict after considering the evidence presented over fifteen days of trial. The jury acquitted defendant of first-degree robbery of one victim (count three) and second-degree aggravated arson (count fifteen), but convicted him of first-degree robbery of Fields' girlfriend (count two) and the second-degree offenses of conspiracy to commit robbery (count one), unlawful possession of

a handgun (count twelve), possession of a handgun for an unlawful purpose (count thirteen), and conspiracy to commit arson (count fourteen). The jury was unable to render a verdict on all murder charges (counts four through eleven), as well as possession of a defaced firearm (count sixteen). Finally, in a separate trial, the same jury convicted defendant of the separately charged certain persons not to possess weapons offense.

At sentencing, on the State's motion, the judge determined defendant was a habitual offender. After merger, he imposed a life term of imprisonment on count two subject to the parole ineligibility period of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2; a concurrent twenty-year term, with a ten-year period of parole ineligibility on count thirteen; a concurrent ten-year term subject to NERA and a mandatory five-year parole supervision on count fourteen; and on the possession of a weapon by certain persons not to possess weapons conviction in the separate indictment, a consecutive ten-year term, subject to a five-year parole ineligibility period. Defendant filed an appeal from these convictions (Docket No. A-0492-11).

Defendant was re-tried by a jury on the four murder, four felony murder and the firearm defilement charges (counts four

14                                                          A-0492-11T4

through eleven and sixteen).  The State's evidence was largely identical to what was presented in the first trial.

On July 11, 2012, the second jury found defendant guilty of all eight homicide counts, but acquitted him on the weapons-defilement count.  After merger, he was sentenced to four consecutive seventy-five-year terms, subject to NERA, and five years of parole supervision upon release.  The sentences were ordered to be served consecutively to the life sentence imposed on the initial conviction.[5]  Defendant appealed (Docket No. A-1593-12).

B.

On appeal defendant raises several issues for review. First, in appealing his initial conviction, docketed at A-0492-11, he argues:

> POINT ONE
> THE IMPROPER EXCLUSION OF EXPERT TESTIMONY TO ASSIST THE JURY IN EVALUATING THE RELIABILITY OF CRITICAL VOICE IDENTIFICATION EVIDENCE REQUIRES THE REVERSAL OF DEFENDANT'S CONVICTIONS.
>
> POINT TWO
> THE GANG EXPERT EVIDENCE IN THIS CASE WAS IRRELEVANT, PREJUDICIAL AND INADMISSIBLE, THEREBY DEPRIVING DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.

---

[5]    The State moved to dismiss count seventeen, which was granted.

POINT THREE
DEFENDANT'S ROBBERY CONVICTION MUST BE
VACATED BECAUSE GIVEN THE STATE'S FAILURE TO
REQUEST AN ACCOMPLICE LIABILITY CHARGE, THE
JURY QUESTIONS DURING DELIBERATIONS, AND THE
PARTIAL VERDICT, IT IS LIKELY THAT THE JURY
IMPROPERLY CONVICTED DEFENDANT OF ROBBERY AS
AN ACCOMPLICE.

Second, in appealing his initial conviction on retrial, docketed

at A-1593-12, defendant argues:

POINT ONE
SINCE THE JUROR EXCUSED DURING DELIBERATIONS
WAS NEITHER ILL NOR UNABLE TO CONTINUE UNDER
[RULE] 1:8-2(d), AND THE JURORS HAD ALREADY
REACHED AN ADVANCED STAGE OF DELIBERATIONS,
HER REMOVAL AND THE COURT'S REFUSAL TO
DECLARE A MISTRIAL VIOLATED DEFENDANT'S
RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL
BY AN IMPARTIAL JURY. U.S. CONST. AMENDS.
V, VI, XIV; N.J. CONST. (1947) ART. I, [¶¶]
1, 9, 10.

POINT TWO
THE GANG EXPERT EVIDENCE IN THIS CASE WAS
IRRELEVANT, PREJUDICIAL AND INADMISSIBLE,
THEREBY DEPRIVING DEFENDANT OF HIS RIGHT TO
A FAIR TRIAL.

POINT THREE
PROSECUTORIAL MISCONDUCT DEPRIVED DEFENDANT
OF HIS RIGHT TO A FAIR TRIAL.

POINT FOUR
EXPERT TESTIMONY PERTAINING TO THE CHEMICALS
TOLUENE AND D5 WAS IRRELEVANT AND
MISLEADING, AND THEREFORE, SHOULD NOT HAVE
BEEN ADMITTED AT TRIAL.

POINT FIVE
DEFENDANT IS ENTITLED TO A NEW TRIAL BASED
ON THE STATE'S DISCOVERY VIOLATION.

A-0492-11T4

We will address these issues seriatim.  Where appropriate, we will include additional factual context and combine similar matters.

## II.

### A.

Defendant asserts several arguments challenging evidentiary determinations made by the trial judge.  Specifically, defendant cites as error:  (1) the exclusion of defense expert testimony evaluating the reliability of voice identification evidence; (2) the admission of what he characterizes as the State's prejudicial, irrelevant gang expert evidence; and (3) the admission of the State's misleading expert testimony pertaining to the chemicals Toluene and D5.

Generally, when reviewing the admission or exclusion of evidence, appellate courts afford "[c]onsiderable latitude" to a trial judge's determination, examining "the decision for abuse of discretion."  State v. Kuropchak, 221 N.J. 368, 385 (2015) (alteration in original) (quoting State v. Feaster, 156 N.J. 1, 82 (1998), cert. denied, 532 U.S. 932, 121 S. Ct. 1380, 149 L. Ed. 2d 306 (2001)); see also State v. Jenewicz, 193 N.J. 440, 456 (2008) (stating "the abuse-of-discretion standard" is applied "to a trial court's evidentiary rulings under Rule 702").  Importantly, "[u]nder th[is] standard, an appellate

court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" Kuropchak, supra, 221 N.J. at 385-86 (quoting State v. Marerro, 148 N.J. 469, 484 (1997)).

> Expert testimony is admissible if it meets three criteria:
>
> > (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [State v. Henderson, 208 N.J. 208, 297 (2011) (quoting Jenewicz, supra, 193 N.J. at 454).]

When considering proffered expert testimony, the trial court exercises discretion in determining "[t]he necessity for, or propriety of, the admission of expert testimony, and the competence of such testimony." State v. Zola, 112 N.J. 384, 414 (1988), cert. denied, 489 U.S. 1022, 109 S. Ct. 1146, 103 L. Ed. 2d 205 (1989). "The qualifications of an expert and the admissibility of opinion or similar expert testimony are matters left to the discretion of the trial court." State v. McGuire, 419 N.J. Super. 88, 123 (App. Div.) (citing State v. Torres, 183

N.J. 554, 572 (2005)), <u>certif. denied</u>, 208 <u>N.J.</u> 335 (2011); <u>State v. Summers</u>, 176 <u>N.J.</u> 306, 312 (2003).

Finally, "[t]he party offering the evidence has the burden of proof to establish its admissibility." <u>Torres</u>, <u>supra</u>, 183 <u>N.J.</u> at 567.

> The proponent of expert testimony must demonstrate that it would "enhance the knowledge and understanding of lay jurors with respect to other testimony of a special nature normally outside of the usual lay sphere." <u>State v. Kelly</u>, 97 <u>N.J.</u> 178, 209 (1984) (quoting <u>State v. Griffin</u>, 120 <u>N.J. Super.</u> 13, 20 (App. Div. 1972)). In addition, the proponent must demonstrate that the expert's testimony would be reliable. <u>Id.</u>
>
> [<u>State v. J.Q.</u>, 252 <u>N.J. Super.</u> 11, 25 (App. Div. 1991), <u>aff'd</u> 130 <u>N.J.</u> 554 (1993)).]

### 1.

On appeal, defendant does not contest the denial of his <u>Wade</u> challenges.[6] Rather, defendant sought to introduce expert testimony from Steven Penrod, Ph.D., a research psychologist and licensed attorney, identifying factors affecting the reliability of what he termed "earwitness" identification. Defendant

---

[6] A separate <u>Wade</u> hearing was conducted to examine whether police identification procedures undergirding the six identification witnesses suffered from impermissible suggestibility. <u>See</u> <u>United States v. Wade</u>, 388 <u>U.S.</u> 218, 87 <u>S. Ct.</u> 1926, 18 <u>L. Ed.</u> 2d 1149 (1967). Specifically, the judge considered defendant's challenges to the reliability of the survivor's testimony regarding her recognition of the voice she heard yelling at her mother on the morning of the murders.

proffered his expert would inform the jury of relevant social science studies and experiments conducted by others regarding the potential for misidentification, designed to aid evaluation of the reliability of the survivor's voice recognition testimony.

Following an <u>N.J.R.E.</u> 104 hearing to discern the admissibility of the expert's proffered testimony, the judge, in a written opinion, reviewed each of the eleven areas set forth in Dr. Penrod's report.[7] The judge concluded the expert's opinion was admissible in part to address the scientific evidence concerning factors affecting the accuracy of identifications. The judge determined the limits of admissibility, deeming certain subjects inadmissible for reasons including: the expert was found not qualified to address the area; the testimony risked misleading the jury; the concepts related matters of common sense; and the opinion tended to tread on the jury's credibility determinations.

Defendant argues "the limited nature of testimony permitted under the [c]ourt's ruling" neutralized the effectiveness of Dr. Penrod as an expert and amounted to reversible error. We are not persuaded.

---

[7]    The report is not included in the appellate record.

Reviewing whether the expert's proffered voice recognition testimony was admissible, the trial judge examined the areas Dr. Penrod discussed. First, the judge disallowed testimony designed to attack a witness's credibility, concluding the latter subject rested solely within the province of the jury. The inclusion of testimony directed to the credibility of other witnesses is not permitted. Henderson, supra, 208 N.J. at 297 ("[E]xperts may not opine on the credibility of a particular eyewitness."). The judge did not suggest, nor do we infer, Dr. Penrod offered an opinion on whether the survivor's recognition was accurate.[8]

Next, the judge determined Dr. Penrod was permitted to testify regarding the relationship of stress and perception, and specifically address the effect on a witness experiencing stress, extreme duress, or danger. The judge found the information would aid the jurors and highlight flaws with the commonly held belief that a person's ability to perceive is heightened under highly stressful circumstances. However, he disallowed testimony regarding voice recognition because Dr.

---

[8] Among the areas of Dr. Penrod's asserted expertise was "a variety of jury issues," including "specialized issues on jury decision making," which amounted to sixty percent of his research grant funding. We determine the judge's opinion was directed to testimony, which at times, related to the influence of a witness' statements. These were correctly found inadmissible.

Penrod never offered an opinion, but only reviewed published research with which he was familiar. As the judge noted, Dr. Penrod "did not provide his own analysis or expertise." Further, Dr. Penrod related only a "minimal recitation of the facts and the process underlying the research" he reviewed and acknowledged some research did not reflect the identification circumstances presented at trial. Thus, the judge found the expert could not testify on the issue because the expert's opinion was not validated by his reasoning or understanding of the underlying methodology of others as applied to the facts at hand. The judge concluded such testimony "would present a risk of misleading the jury."

Dr. Penrod was also permitted to opine on the relationship of a witness's confidence or level of certainty in making the identification and its accuracy. However, he was excluded from testifying regarding the impact of subsequent events as affecting witness confidence because the issue was "a matter of common sense."

Dr. Penrod next discussed the small body of research, although he did not name the researcher, suggesting when people view a face and a voice simultaneously the chance of misidentification increases. The judge disallowed this testimony, noting the doctor "did not apply his own analysis or

expertise" on the issue, but "merely repeated the results of the other researcher's studies" and the manner in which the study was conducted was not described. The judge concluded the expert "was unqualified" in this area and his "testimony would present a risk of misleading the jury."[9] Similarly, regarding "unconscious transference," the act of transferring one person's identity to another "from a different setting, time or context," the judge found Dr. Penrod did not apply his analysis or expertise to the research he reviewed, and his comments would risk misleading the jury.

The judge also found inadmissible opinion regarding: an individuals' ability to estimate duration of events; the idea that identifications are at times inaccurate; concepts stating the longer an individual hears a voice and alterations in the speaker's tone increases the accuracy of the identification; the fact that other competing voices overlaid with a speaker's makes identification more difficult; and the longer the delay following an event, the less accurate the subsequent identification. All of these concepts were determined to be

---

[9] The suggestion the survivor viewed defendant's face when in his company two weeks earlier is not in the record. The survivor only testified during this encounter she sat in the back seat of the Jeep while defendant sat in the front seat.

within an average juror's common knowledge and capable of evaluation without need of an expert opinion.

Finally, on reconsideration, in light of a recently released special master's report presented to assist the Court's review in Henderson, the trial judge considered two additional areas sought to be presented by Dr. Penrod. First, in light of the survivor's testimony, the judge concluded the expert could discuss the effect on identification when a witness is told by police a suspect was apprehended, conditioned on his demonstration of expertise. Second, the trial judge recognized "jurors tend to underestimate the importance of the memory retention interval." However, he noted Dr. Penrod's testimony stated the "concept of memory decay falls within the area of common sense." Consequently, the judge declined to disturb his prior ruling. Defendant chose not to call Dr. Penrod at trial.[10]

---

[10] In the event of a Wade hearing, the accuracy of eyewitness identification, particularly cross-racial identification, has come under scrutiny. Much research has been devoted to understanding factors influencing such identifications, concentrating on encounters between strangers. In State v. Henderson, Chief Justice Rabner, writing for the unanimous Court, comprehensively discussed social science research as presented by a special master's report. The Court reviewed in detail various "system variables," within the State's control, Henderson, supra, 208 N.J. at 248-61, and "estimator variables," representing factors outside the control of the criminal justice system, affecting an eyewitness' ability to perceive and remember an event. Id. at 261-72. Henderson provides insight regarding research limited to eyewitness identifications and

(continued)

Following our review, we note throughout his testimony Dr. Penrod conflated eyewitness identification with voice recognition, often making no differentiation between the two. In much of his discussion, Dr. Penrod listed factors and research affecting mistaken eyewitness testimony with little or no correlation to how these concepts applied to voice recognition or this matter. While the evidence perhaps supported a theory that many identifications were mistaken, it did not clearly explain what analysis a juror should undergo to assess the State's voice identification evidence.

Also, Dr. Penrod's testimony, generally, did not reveal the methodologies used by the researchers he cited to. This lack of foundation undermined the validity of wholesale acceptance of the restated conclusions. Rather than offering his reasoning based on his experience and study regarding the impact on memory, in turn affecting the accuracy of identification based on sight or hearing, Dr. Penrod was described by the trial judge as "parroting" the research.[11] To the point, Dr. Penrod's

(continued)
courts now have the benefit of a legal standard for assessing the suggestibility and reliability of eyewitness identification evidence. Henderson announced a new rule of law and the Court directed its holding be applied "prospectively." Id. at 220.

[11] Dr. Penrod's testimony states the underlying nature of the studies he referenced were contained in his report, a document
(continued)

testimony did not explain exactly what he relied on for voice recognition opinions. We do not know whether he referred to empirical research, articles, or articles about research. In the absence of this analysis we cannot agree the judge clearly abused his discretion or embarked on a clear error in judgment by limiting Dr. Penrod's expert opinion testimony. State v. J.A.C., 210 N.J. 281, 295 (2012).

On some matters, Dr. Penrod was found not qualified to present an opinion because he failed to use his knowledge and experience, and apply the research to reach the opinion he espoused. For example, when asked on cross-examination to relate any details about the ten cases in which he had presented voice recognition expert testimony, he could not. Moreover, he

---

(continued)
not provided by defendant on appeal. Nevertheless, Dr. Penrod's testimony refers to voice recognition studies conducted by researchers in Canada and the United Kingdom. One 1994 study by Daniel Yarmey, Ph.D., involved voice identification from a voice line-up, a circumstance not relevant here. Moreover, introduction of Yarmey's conclusion would necessitate introduction of the nature of his experiment as well as the instructions given to his college student participants performing the evaluation, along with possible factors impacting their identification. This problem is also illustrated by S. Pryke's study, also referred to by Dr. Penrod in his testimony. Dr. Penrod described this only as "look[ing] at multiple aspects of identification for one event[:] people who were able to identify voice, face, and . . . clothing." The judge's decision to exclude recitation of these conclusions as misleading because they were unaccompanied by the expert's analysis of the studies represents a proper exercise of discretion.

had limited information on the manner in which some studies he cited were conducted, and for others he recognized the conditions that diverged considerably from the facts at hand. For instance, a study determining how inaccurate voice identifications occur when subjects listen to recorded voice exemplars of strangers is significantly dissimilar to what occurred here.

The weighing of the admissibility of expert testimony, which is focused on factors that may produce unreliable identifications, cannot be lightly undertaken. "By merely being labeled as a specialist in eyewitness [or earwitness] identifications, an expert has the broad ability to mislead a jury through the 'education' process into believing a certain factor in an eyewitness [or earwitness] identification makes that identification less reliable than it truly is." State v. Young, 35 So. 3d 1042, 1050 (La. 2010) (citing United States v. Angleton, 269 F.Supp. 2d 868, 873-74 (S.D. Tex. 2003)).

"The necessity for, or propriety of, the admission of expert testimony, and the competence of such testimony, are judgments within the discretion of the trial court." State v. Long, 119 N.J. 439, 495 (1990) (quoting Zola, supra, 112 N.J. at 414). "[A] trial judge has a responsibility to screen expert evidence for reliability and to determine the total effects of

proposed evidence, weighing its probative value against its potential to (among other things) confuse the jury." United States v. Schiro, 679 F.3d 521, 529 (7th Cir. 2012) ("If jurors are merely told that voice identifications frequently are mistaken, what are they to do with this information?  The defendant's lawyer will argue mistaken identification and jurors told that such mistakes are common may be afraid to make their own judgment."); see also Landrigan v. Celotex Corp., 127 N.J. 404, 414 (1992) (noting the key to the admissibility of a particular expert's testimony is "the validity of the expert's reasoning and methodology" and his or her ability to explain scientific principles and to apply them in such a way that he or she is not simply "self-validating").  We defer to the trial judge, who had the benefit of reading Dr. Penrod's report, as well as observing his testimony, and nevertheless found the omission of analysis risked juror confusion.

We will not interfere with the conclusion that aspects of Dr. Penrod's testimony were excluded because they involved readily known and understood concepts, not aided by expert opinion.  Observations such as the longer a speaker hears a voice, the more accurate a later identification is "unremarkable."  Angleton, supra, 269 F. Supp. 2d at 874 ("The proposition that increasing the length of the recorded speech

increases the accuracy of voice identification seems intuitive."). So, too, the possible inaccuracy of a person's time estimation and the decrease in accuracy when voices are accompanied by other distractions are also self-evident and intuitive. See People v. Clark, 833 P.2d 561, 614 (Cal. 1992) ("[I]t is a matter of common experience that the ability to remember a perceptive experience diminishes over time. It is also generally known that voices may sound slightly different through different media."), cert. denied, 507 U.S. 993, 113 S. Ct. 1604, 123 L. Ed. 2d 166 (1993). Identifications can be imperfect. However, that alone will not render obsolete the factual analyses necessary for the admission of expert evidence.

We agree with our dissenting colleague that a witness is not disqualified because he did not conduct independent research. See State v. Smith, 21 N.J. 326, 334 (1956) ("[A]n expert may be qualified by study without practice."). Nor is there dispute Dr. Penrod is a recognized expert in eyewitness identification. However, an expert must provide the basis for his opinion and relate it to the facts of the case. While Dr. Penrod generally discussed concepts relating to the fallibility of eyewitness identification and related research regarding the reliability of voice recognition, oftentimes his focus was not on the factors aiding analysis of voice recognition that fell

outside of common experience. By merely reciting the findings of other researchers, Dr. Penrod did not adequately relate his specialized knowledge or analyze concepts he studied. Thus, his opinion did not aid the jury's ability to distinguish factors bearing on voice recognition.

We also agree the judge inartfully suggested "if the jury were provided documentation of the study, they would be able to come to the same conclusion." Following our review, we understand this reference was directed to the underpinnings of the research, found to be either sparsely mentioned or involved circumstances differing from the voice identification of this case. This is why our dissenting colleague's view as to the learned treatise exception, Rule 803(c)(18), misses the mark.[12]

At its core, the purpose of the learned-treatise exception is to allow statements from the treatise to be admitted as

_____

[12]  The dissent argues:

> [t]he trial judge made the inconsistent finding that a distinguished expert in the field of witness identification did not know enough to explain the research, but the jury would somehow know and understand it if given the studies. Jurors not only cannot be given the studies, but are instructed to not use the internet or do their own research as they cannot consider studies that are not in evidence through the testimony of an expert.
>
> [Post (slip op. at 17).]

A-0492-11T4

substantive evidence, with the caveat that the expert be on the stand to explain the studies he or she relies on and testify to the methodology or assist in its application.  See Jacober v. St. Peter's Med. Ctr., 128 N.J. 475, 491 (1992) (explaining that the learned-treatise exception is designed for "situations in which an expert is on the stand and available to explain and assist in the application of the treatise if desired").  Thus, an expert may not be called for the sole purpose of qualifying a treatise, nor may a treatise be introduced as a substitute for expert testimony.  Biunno, Current N.J. Rules of Evidence, comment on N.J.R.E. 803(c)(18) (2015).  Here, Dr. Penrod could not adequately explain or assist in the application of the studies he introduced on voice identification.  Instead, he only offered the conclusions without sufficient supporting information to assist the jurors in analyzing the studies, rendering that testimony inadmissible.

Importantly, the judge did not reject the underlying scientific research regarding the accuracy of voice identification as suggested by our dissenting colleague, see post (slip op. at 3).[13]  Rather, the judge disallowed testimony

---

[13]   We consider our dissenting colleague's view as suggesting the trial judge found the expert's opinion on earwitness testimony unreliable, a subject warranting de novo review.  See post (slip op. at 2-4).  Certainly, in a criminal trial the
(continued)

based on unexplained research conducted under circumstances unlike those presented in this matter, which is simply a witness's later recall of a familiar voice, State v. Hackett, 166 N.J. 66, 81 (2001) ("[T]he uncritical acceptance of expert testimony can becloud the issues." (quoting State v. R.W., 104 N.J. 14, 30 (1986))), and found other opinions unnecessary because they addressed a subject understood by jurors who utilized common judgment and experience, see State v. Sowell,

_____

(continued)
admissibility of scientific test results is permitted only when shown to be generally accepted as reliable within the relevant scientific community. State v. Chun, 194 N.J. 54, 91, cert. denied, 555 U.S. 825, 129 S. Ct. 158, 172 L. Ed. 2d 41 (2008); State v. Harvey, 151 N.J. 117, 169-70 (1997); see also State v. Moore, 188 N.J. 182, 206 (2006) (holding scientific theories are accepted as reliable when "based on a sound, adequately-founded scientific methodology involving data and information of the type reasonably relied on by experts in the scientific field" (quoting Rubanick v. Witco Chem. Corp., 125 N.J. 421, 449 (1991))).   Further, we agree "[a]n appellate court may independently review scientific literature, judicial decisions, and other authorities to determine whether proposed expert testimony is scientifically reliable and has obtained general acceptance so that it may be admitted in our courts." McGuire, supra, 419 N.J. Super. at 123-24 (citing Torres, supra, 183 N.J. at 567).   However, we do not agree the judge's determinations of admissibility turned on this issue.   Nor does the record on appeal contain evidence allowing such a review.

For the reasons discussed in our opinion, the inadmissibility of Dr. Penrod's expert opinion was found to turn on other bases, which we examined.   We also note expert testimony meeting the criteria for admission may nevertheless be excluded under other rules.   See, e.g., N.J.R.E. 704 (excluding opinion embracing an ultimate issue); N.J.R.E. 403 (excluding opinion that would necessitate undue consumption of time or create substantial confusion).

213 N.J. 89, 99 (2013) (noting expert testimony is unnecessary to discuss a matter within the jury's competence and understanding); Hackett, supra, 166 N.J. at 83 (rejecting expert testimony because the determination was not beyond the ken of the average juror or "so esoteric that jurors of common judgment and experience cannot form a valid judgment" (quoting Butler v. Acme Markets, 89 N.J. 270, 283 (1982))).

We do not conclude the judge abused his discretion when limiting aspects of the proffered evidence. McGuire, supra, 419 N.J. Super. at 123. He satisfactorily detailed areas where the expert's reasoning and methodology on "earwitness" identification testimony seemed self-validating or jumbled with eyewitness identifications, a topic the expert was admittedly more familiar with. As a result, the expert's proffered testimony not only risked juror confusion but also tended toward subjects where expert opinion would be unnecessary. Further, the judge did not preclude the totality of the expert's testimony, which defendant chose not to present to the jury.

Moreover, we underscore the identification at issue was the survivor's recollection it was defendant's voice she heard. This identification was one of several introduced by the State and is not the sole identification evidence placing defendant at the scene of the murders. The survivor was familiar with

defendant and had spent ten minutes talking with him in the Jeep two weeks earlier. Police did not conduct a voice array from which the survivor matched the voice she heard. See State v. Gallagher, 286 N.J. Super. 1, 18 (App. Div. 1995) (using voice array to identify a defendant), certif. denied, 146 N.J. 569 (1996). Nor was the survivor's recollection prompted by police interrogation. In fact, the day following the murders, as the survivor recounted the events to her boyfriend, unprompted, she realized the man in her home was defendant.[14]

Next, we reject as lacking merit defendant's additional suggestion of prosecutorial misconduct during summation, when referencing the survivor's reported recollection of defendant's voice. Defendant directs his attack to this statement by the prosecutor: "A traumatic event like that, Ladies and Gentlemen, one could logically infer, reasonably, that she replayed that

---

[14] We disagree with our dissenting colleague's assertion stating a new trial is necessary because Dr. Penrod's testimony "undermined the testimony of, perhaps, the most credible witness to identify defendant, albeit by voice." See post (slip op. at 1). Further, we cannot abide the minimization of the State's evidence against defendant, characterized in the dissent as "two convicted felons who testified in exchange for sweetheart plea deals, and a young woman who survived the crimes by hiding in a closet." See post (slip op. 2). The State presented more than twenty witnesses, five lay individuals, experts, law enforcement, scientists from the State crime lab and fire officials. Our role in reviewing this matter does not include making credibility assessments, as such a determination rests solely with the jury.

over and over in her mind, and she, by doing that, determined who that voice was."

Not only was no objection made at trial, suggesting the statement was innocuous, but also evidential support for the statement was included in the survivor's testimony. See State v. Carter, 91 N.J. 86, 127 (1982) (stating a prosecutor may argue any conclusion rationally supported by evidence). The prosecutor's assertion restated facts and responded to defendant's vigorous cross-examination attacking the survivor's ability to identify defendant's voice. No plain error is found. R. 2:10-2.

2.

Defendant also challenges the admission, over his objection, of the State's expert on gang-related activity, Lieutenant Earl J. Graves of the Essex County Prosecutor's Office. Defendant contends the trial judge abused his discretion by allowing testimony, which exceeded "even the broad boundaries" permitted for admission of such evidence. He argues defendant's involvement in a gang had no relevance to motive, opportunity, or the victims and co-defendant's involvement in the crimes. As a result, its admission was extremely prejudicial, warranting a new trial. During retrial, the same objection was raised when the State sought to use the same

expert evidence and witness. We have reviewed both transcripts and note the State's evidence is generally consistent. Therefore, we have chosen to describe the issue as it unfolded in the first trial, understanding the same arguments arose on retrial.

The introduction of expert testimony regarding gang behavior is guided by State v. Torres, 183 N.J. 554 (2005). In Torres, the defendant was charged with first-degree murder as an accomplice in the killing of a member of his gang by fellow gang members. Id. at 562-64. Examining whether gang-related expert testimony was admissible under N.J.R.E. 702, the Court aligned with other jurisdictions and concluded "testimony explaining the structure, organization, and procedures of street gangs would be helpful to a jury's understanding of the relevant issues at trial." Id. at 573. However, the Court cautioned expert gang testimony

> must be restricted to those areas that fall outside the common knowledge of jurors. For example, a juror generally would not be expected to be familiar with the structure and organizational aspects of gangs or the significance of particular gang symbols. Those areas fall within the specialized knowledge of the expert, who by virtue of his training, experience, and skill can shed light on such subjects.
>
> [Ibid.]

In Torres, the expert testimony regarding a defendant's gang involvement was "relevant to show the connection between defendant's actions as the leader of the gang and the actions of the other gang members who actually committed the murder." Ibid.

During a Rule 104 hearing, Lieutenant Graves testified as to the origination of the specific gang set to which defendant, Fields, Wigfall and Williams belonged. He identified the gang structure, explaining defendant's role as an "OG" or "original gangster" who headed a set, and the role of the soldiers in a gang, explaining the information was provided by defendant and recorded in prison classification documents. Also discussed was the significance of tattoos to identify gang affiliation and "intimidate" or "influence" others. Specifically linking his expertise to the facts in this matter, Lieutenant Graves noted his review of the wiretapped phone calls with Davis, revealed defendant's statements support the understanding that he holds a leadership position in a gang set and identified himself as a "Triple OG."

In a comprehensive oral opinion, the judge concluded Lieutenant Graves was qualified as an expert in street gangs and permitted him to testify, concluding defendant's claims of prejudice were not outweighed by the probative value of the

evidence. In reaching this conclusion, the judge reviewed the evidence under the rigors of the four-factor test identified in State v. Cofield, 127 N.J. 328, 338 (1992), and evaluated its admissibility under N.J.R.E. 404(b).[15] In doing so, the judge concluded the evidence was relevant to "defendant's opportunity, knowledge and motive" to commit the crimes targeted to this specific home and family. The judge barred testimony regarding alleged gang habits for weapons used in criminal activity.

In discussing the claimed prejudice to defendant, the judge noted there was clear and convincing evidence of defendant's gang involvement, including his own statements, the survivor's testimony stating Fields, Williams and Wigfall knew each other

---

[15] "In Cofield, the Court developed 'a rule of general application in order to avoid the over-use of extrinsic evidence of other crimes or wrongs[.]'" State v. Sheppard, 437 N.J. Super. 171, 189 (App. Div. 2014) (alteration in original) (quoting Cofield, supra, 127 N.J. at 338), certif. denied, 221 N.J. 219 (2015). The four-pronged test for admissibility of other evidence of prior bad-acts includes:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Cofield, supra, 127 N.J. at 338.]

from their gang set, Hayes' compliance with defendant's requests and the significance of defendant showing Hayes his tattoo. The judge found the prejudice to defendant by the expert's testimony was not outweighed by the probative value supporting motive and opportunity for commission of the crimes, including defendant's access to Williams' red Jeep, defendant's knowledge of the drugs and money held by Fields' girlfriend, defendant's access to her home, and Hayes' reaction to defendant's tattoo.

Defendant moved for reconsideration, arguing the testimony was unnecessary to explain other lay witness statements and duly prejudicial. The motion was denied. Also, defendant's objection during trial prior to the State's presentation of the witness was overruled.

At trial, following voir dire, Lieutenant Graves was asked limited questions regarding the gang set, code names used for guns and weapons, the use and significance of tattoos, the set's structure, enforcement of discipline, and use of personal property. His testimony and expressed opinion was far more circumscribed than that presented in the Rule 104 hearing. He stated only that defendant was a member of the gang set based on his tattoo and statements during the wiretap.

On appeal, defendant maintains "the workings of the gang were not even marginally related to the crime and defendant's role in it." We disagree.

At trial, the survivor connected Fields, Williams and Wigfall to the same gang and stated defendant "was in the gang as well" and "was . . . over all of them." Fields confirmed the gang relationship of the parties and that defendant told Hayes the robbery was of "his man's girl," referring to Fields. Lieutenant Graves also confirmed Davis' testimony regarding defendant's statements about "his girlfriend" were references to his gun, although Lieutenant Graves admitted the reference was not necessarily limited to gang members. In his conversations with Hayes, defendant conveyed a message by specifically drawing attention to his set tattoo. Lieutenant Graves also noted defendant's higher rank in the gang caused Williams to give defendant his Jeep when directed to do so.

The limited areas covered by the expert aided the jury's understanding of defendant's reference to his tattoo when telling Hayes he did not "want any co-defendants" as an implied threat to secure his silence, defendant's use of Williams' Jeep, and defendant's relationship with Davis, Williams, Wigfall, Fields and his girlfriend. Moreover, as the trial judge noted, no other evidence could fully explain defendant's opportunity in

40

committing these crimes, and why the events unfolded as they did.

We also reject the notion defendant's convictions resulted because of evidence of his gang membership. See State v. Goodman, 415 N.J. Super. 210, 226 n.4 (App. Div. 2010) (reaffirming a court "may not convict an individual merely for belonging to an organization that advocates illegal activity") (quoting United States v. Abel, 469 U.S. 45, 48, 105 S. Ct. 465, 467, 83 L. Ed. 2d 450, 455 (1984)), certif. denied, 205 N.J. 78 (2011). To reach such a result would require us to disregard the judge's supported findings leading to his conclusion the proffered testimony was helpful for the jury's understanding or other witness testimony and not designed to enhance the State's evidence. Moreover, such a conclusion gives no consideration to the jury selection voir dire[16] and jury instructions issued by the trial judge limiting the use of the evidence.

We determine no basis to interfere with the judge's exercised discretion in admitting Lieutenant Graves' circumscribed testimony, which provided a framework for the jury's understanding of key events, testimony by the lay

---

[16] A series of five questions issued during jury selection examined whether a prospective jury could remain fair and impartial in performing as a juror if evidence of defendant's gang involvement was presented.

witnesses and the relationship between defendant and co-defendants.[17] Finally, the judge mitigated possible prejudice through the use of direct voir dire questions during jury selection. Goodman, supra, 415 N.J. Super. at 234; State v. Muhammad, 145 N.J. 23, 52 (1996) (stating "there is no reason to

---

[17] Our dissenting colleague concludes the expert testimony is neither relevant nor probative, but "significant[ly]" prejudicial. See post (slip op. at 40). We cannot accept this view, which appears to overstate the breadth of the ten pages containing Lieutenant Graves' sustentative direct and cross-examination testimony. At trial, Lieutenant Graves did not opine that defendant was a higher ranking member than Fields, Williams and Wigfall, see post (slip op. at 38), or state defendant had no fear of retaliation from Fields because of gang hierarchy, see post (slip op. at 39). Rather, Lieutenant Graves succinctly related the general gang set hierarchy. Facts regarding defendant's rank and authority in the gang were elicited by Hayes, Fields and the survivor. Also, we note the dissent rejects the judge's factual findings in favor of an independent weighing of the evidence, including the credibility attached to facts asserted by other State witnesses.

As to whether the testimony was unduly prejudicial, our colleague emphasizes that gang evidence is inherently prejudicial. Certainly, "[o]ther-crimes evidence is considered highly prejudicial." State v. Vallejo, 198 N.J. 122, 133 (2009). However, the trial judge considered all evidence and took appropriate steps at voir dire to mitigate possible prejudice. The trial judge also crafted explicit jury instructions limiting the jury's use of the evidence as to motive. See Goodman, supra, 415 N.J. Super. at 230 (admitting gang evidence to prove motive). "The mere possibility that evidence could be prejudicial does not justify its exclusion." State v. Long, 173 N.J. 138, 164 (2002). The trial court is necessarily in the best position to balance possible resulting prejudice from the admission of this evidence. State v. Krivacska, 341 N.J. Super. 1, 40 (App. Div.), certif. denied, 170 N.J. 206 (2001), cert. denied, 535 U.S. 1012, 122 S. Ct. 1594, 152 L. Ed. 2d 510 (2002).

believe that jurors will not act responsibly in performing their duty").

We also reject, as unfounded, defendant's claim Lieutenant Graves' testimony exceeded the bounds permitted by the judge and the Court in <u>Torres</u>. Defendant identifies no specific statement or line of testimony to support this contention. His broad generalization is rejected as meritless. <u>R.</u> 2:11-3(e)(2).

### 3.

Defendant further cites as error the admission of testimony regarding the chemicals toluene and decamethylcyclopentasiloxane (D5) found at the crime scene, in the red Jeep, and on Hayes' clothing. This issue was raised not only in the initial trial, but also on retrial.[18]

On appeal, defendant argues, as he did before the trial judge, the testimony was not relevant because the existence of these substances failed to prove his guilt. We disagree.

The evidence was related to the aggravated arson and conspiracy to commit aggravated arson charges. The State's witness, a chemist who qualified as an expert in fire debris and hair analysis, explained although often found in various household products, it was rare to find these two volatile

---

[18] The same judge tried each matter. His ruling during retrial remained consistent with his initial decision. In presenting the issues, we describe it as presented initially.

substances together. Yet she isolated both chemicals on clothing worn by the victims, in the Jeep, and on several articles of Hayes' clothing. Although not probative of how the fire started, the proofs tended to corroborate Hayes' version of events because the unusual combination of substances found in these places logically linked Hayes to Fields' girlfriend's apartment and the Jeep. See State v. Koskovich, 168 N.J. 448, 480-81 (2001). Thus, there was a logical connection between the State's proffered evidence and a fact in issue. State v. Hutchins, 241 N.J. Super. 353, 358 (App. Div. 1990).

We conclude the judge properly analyzed the issues and correctly noted defendant's challenges affected the weight of the evidence and not its admissibility. N.J.R.E. 403. Further, the judge also noted the probative value outweighed any possible prejudice, which was skillfully borne out during cross-examination, and which perhaps led to the jury's verdict acquitting defendant of aggravated arson. See Hisenaj v. Kuehner, 194 N.J. 6, 24-25 (2008) (deficiencies in expert report were explored during cross-examination and jury was charged with determining the opinion's weight).

### B.

Defendant argues the judge erroneously denied his motion for a new trial on the first-degree robbery charge. Defendant

suggests the jury's questions and the resultant deadlock on murder and felony murder shows some jurors likely relied on a theory of accomplice liability to support the related robbery conviction. Defendant maintains the State's failure to include an accomplice liability charge precludes his conviction for first-degree robbery. We are not persuaded.

After receiving the charge, which included Model Jury Charge (Criminal), "Robbery in the First Degree (N.J.S.A. 2C:15-1)" (Sept. 10, 2012),[19] and Model Jury Charge (Criminal), "Felony Murder-Slayer Participant (N.J.S.A. 2C:11-3(a)(3))" (March 22, 2004), the jury submitted questions during deliberations including: "Does felony murder mean the defendant killed the victims in this case, or does it mean that he was present during the murders, but did not actually kill the victims?" The State's theory of the case against defendant was principal liability. Defendant suggested the question showed the jury was considering defendant's guilt as an accomplice, which was never presented.

---

[19] The model charge cited is the one provided by the State in its appendix, but the charge in effect at the time of trial in 2011 was Model Jury Charge (Criminal), "Robbery in the First Degree (N.J.S.A. 2C:15-1)" (May 10, 2010). Nevertheless, neither side claims the modification presents a meaningful distinction.

The judge granted defendant's request to respond directly to the jury question and then reread the applicable charges. He informed the jury:

> Okay, just so it's crystal clear, Ladies and Gentlemen, I'm going to reread your question number 2 and then answer it in two parts.
>
> "Does felony murder mean that the defendant killed the victims in this case?" In short, the answer is yes. In order to find the defendant guilty of felony murder, you must find beyond a reasonable doubt that this defendant, Mr. Terrell, killed the victims in this case.
>
> And then the second part, "Or does it mean that he was present during the murders and did not actually kill the victims," the short answer to that question is no.

The judge elaborated on these direct answers, making it clear the jury could not find defendant guilty of felony murder "unless you first find him guilty beyond a reasonable doubt of having committed . . . the robbery. . . . [I]n summary, . . . in order for [defendant] to be found guilty of murder, the State must prove beyond a reasonable doubt that the defendant is the person who actually killed the victims." This latter instruction was repeated when recharging felony murder, and the judge added "felony murder does not mean that the defendant was merely present during the murders," but defendant had been "engaged in the commission of, or attempt to commit, or flight

A-0492-11T4

after committing, or attempting to commit, the crime of robbery, as charged in counts 2 and 3."

Deliberations resumed and additional questions from the jury issued. One question asked whether, with respect to felony murder, "a person would have to directly rob the person murdered, or does this merely mean that any one person within the household was robbed and members of the household were murdered? This seems to be a contradiction."

The judge informed the jury that neither the indictment nor the verdict sheet were evidential. He then instructed:

> In order for you to find the defendant . . . guilty of felony murder, you must find beyond a reasonable doubt that he killed the victims named in [the indictment] during the course of committing a robbery of . . . [Fields' girlfriend] and [the survivor] regardless of whether he did so purposely or even knowingly, or recklessly or unintentionally, or even by accident. . . . [Y]ou cannot find [defendant] guilty of felony murder unless you first find him guilty beyond a reasonable doubt of having committed the crime of robbery.

The verdict sheet reflected the jury found defendant guilty of robbing Fields' girlfriend, but not guilty of robbing another victim. The jury could not reach a verdict on the murder and felony murder counts.

Ruling on defendant's motion for a new trial, the judge rejected defendant's argument the deadlock on the felony-murder

charge must mean "[a]t least one of the jurors must have believed that defendant was an accomplice, not the principal, with respect to the killings." Defendant's argument, if he were the principal, assumed, as suggested by the guilty verdict on the robbery charge, he would have been convicted of felony-murder. The judge found the State's evidence was sufficient to support the first-degree robbery conviction.

A motion for a new trial is granted in the interests of justice, but the court shall not set aside a jury verdict as against the weight of the evidence "unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law." R. 3:20-1. The motion is decided in the court's discretion in light of the credible evidence and with deference to the trial judge's feel for the case and observation of witnesses. State v. Brooks, 366 N.J. Super. 447, 454 (App. Div. 2004). In our review, we do not attempt to reconcile the verdicts on the different counts nor do we speculate whether verdicts resulted from "jury lenity, mistake, or compromise," and even inconsistent verdicts. State v. Muhammad, 182 N.J. 551, 578 (2005). For purposes of appellate review, this court considers the evidence presented in support of each count as

though it were presented in a separate indictment. Ibid. The jury verdict will be upheld where there is sufficient evidence to support the conviction on that charge. Ibid.

Here, defendant was charged under N.J.S.A. 2C:15-1, providing a person is guilty of first-degree robbery when in the course of a theft he or she attempts to kill, purposely inflicts serious bodily injury, or uses or threatens the use of a deadly weapon. Neither the State nor defendant sought an accomplice liability charge.

Evidence from both the survivor and Hayes satisfied the requisite proof requirements beyond a reasonable doubt for first-degree robbery. Hayes described defendant's use of a gun held to Fields' girlfriend's neck, while demanding she turn over the drugs and money she held. Defendant's attempt to view the robbery and felony-murder verdicts as a combined offense is rejected. The evidence supporting first-degree robbery could be separated from the evidence of the murders. These verdicts are not inconsistent. The trial judge's analysis of the sufficiency of the evidence when denying defendant's motion for a new trial is well supported.

### C.

After deliberations commenced in the retrial, two jurors requested to be excused. Defendant contends the court erred in

handling these requests by not properly making necessary findings before excusing one of the two jurors. He maintains the judge's inquiry and conclusory findings were flawed and dismissal and replacement of one juror, over defendant's objection, rather than declaring a mistrial, was error. We reject these arguments.

The jury had deliberated for less than eight hours, spread over three days (excluding time periods spent listening to testimony read back), when the judge informed counsel he received a note stating: "Two jurors, Number 2 and Number 6, would like to be replaced." Counsel was consulted regarding how to proceed. Defendant argued the judge should "not react" because the juror's note was not specific as to the hardship and "pulling them out now -- it might be premature." The State disagreed and reminded the judge "Juror [2] was originally the juror that was perceived to have been spoken to. Whether you term it as a threat — but it was an outside communication to her on Friday morning as she walked into the courthouse." The State also noted juror six related she recorded an outside communication encounter. Jurors two and six were actually being transported to and from the courthouse by the sheriff's department. Following argument, the judge conducted separate

limited voir dire of the jurors.  As a result of the jurors' responses, the judge excused juror two and retained juror six.

After explaining he "just want[ed] to broadly discuss the issue of why a note indicating that you would like to be replaced was sent out; that's the focus of the discussion, nothing having to do with the jury deliberations[,]" the judge engaged in the following colloquy with juror two:

> THE COURT:  Do you feel that there is emotionally an inability for you to proceed and perform your duties as a deliberating juror?
>
> THE JUROR:  Yes.
>
> THE COURT:  Do you feel that these emotions that you have, again, would impact upon your ability to perform your function in this case?
>
> THE JUROR: No.   I know it's not balanced in what I'm saying, but there's [sic] reasons why I can't speak without giving away —
>
> THE COURT:  I don't want you to talk about that.  But emotionally, you feel you can't continue?
>
> THE JUROR:  Correct.
>
> THE COURT:  I'm going to leave it at that for now.  Thank you.

Similar questions were posed to juror six, who stated she had neither emotional nor personal reasons presenting an inability to proceed and perform the duties of a deliberating

juror. The judge questioned whether something else prevented her from continuing to serve as a juror, without going into jury deliberations. She replied: "Without going into — it is very difficult to explain-" The judge interrupted, warning: "I don't want to go there." Juror six confirmed her reason for wanting to be excused was neither emotional nor physical.

One of the two alternates replaced juror two. Juror six returned to the panel. The judge issued supplemental instructions and directed deliberations begin anew with the replacement juror. The jury then retired for the evening. Deliberations commenced the following morning. Approximately two-and-one-half hours following the replacement of juror two, the jury reached a verdict.

"Our review of a trial court's decision to remove and substitute a deliberating juror because of an 'inability to continue,' pursuant to <u>Rule</u> 1:8-2(d)(1), is deferential." <u>State v. Musa</u>, 222 <u>N.J.</u> 554, 564-565 (2015). "We will not reverse a conviction unless the court has abused its discretion." <u>Id.</u> at 565.

The substitution of a juror in the course of deliberations "does not in and of itself offend a defendant's constitutional guarantee of a trial by jury." <u>State v. Ross</u>, 218 <u>N.J.</u> 130, 146 (2014) (quoting <u>State v. Williams</u>, 171 <u>N.J.</u> 151, 162 (2002)).

A-0492-11T4

"Such a substitution, however, contravenes constitutional norms if it impairs the mutuality of deliberations — the 'joint or collective exchange of views among individual jurors.'" Id. at 146-47 (quoting Williams, supra, 171 N.J. at 163). Indeed, "[b]ecause juror substitution poses a clear potential for prejudicing the integrity of the jury's deliberative process, it should be invoked only as a last resort to avoid the deplorable waste of time, effort, money, and judicial resources inherent in a mistrial." State v. Hightower, 146 N.J. 239, 254 (1996).

> The court must be prepared to declare a mistrial if a substitution would imperil the integrity of the jury's process. [Id. at 253-54.] The trial judge's task is complicated by the need to diligently protect the confidentiality of jury communications as he or she inquires about the status of the juror in question. In short, the trial court must appraise the impact of a juror substitution on the jury process, without tainting that process with intrusive questions. It must conduct any inquiry with respect to the juror in question . . . with caution and restraint.
>
> [Ross, supra, 218 N.J. at 147.]

Accordingly, a trial judge "must determine the cause of the juror's concern and assess the impact of the juror's departure on the deliberative process." Ibid. Further, the judge must "ascertain whether a reconstituted jury will be in a position to conduct open-minded and fair deliberations." Ibid.

In Ross, the Court reviewed consideration of this issue and reaffirmed that when "evaluating the cause of a juror's departure, our courts distinguish between reasons that are personal to the juror, which may permit a substitution under Rule 1:8-2(d)(1), and issues derived from 'the juror's interaction with the other jurors or with the case itself,' which may not." Ibid. (quoting Williams, supra, 171 N.J. at 163). Also, "a juror's psychological condition as a reason that he or she cannot continue to serve" has been addressed, noting "[t]he 'inability to continue' language of Rule 1:8-2(d)(1) 'has been invoked to remove a juror under circumstances that reveal the juror's emotional condition renders him or her unable to render a fair verdict.'" Id. at 148 (quoting Williams, supra, 171 N.J. at 164); see also State v. Miller, 76 N.J. 392, 406-07 (1978) (holding judge properly substituted an alternate for juror who explained because of "his then nervous and emotional condition, he did not think he could render a fair verdict"). In conducting this examination, the judge must not permit the juror to reveal confidential jury communications.

Defendant argues juror two's explanations fell short of what is required to satisfy the "inability to continue" standard, stating the juror did not reveal she was unable to render a fair verdict. He additionally infers from juror two's

comments she was at odds with other jurors, a circumstance not justifying excusal. See State v. Jenkins, 182 N.J. 112, 124-25 (2004) (holding excusing a juror cannot be based on juror interaction with other jurors). We cannot agree the juror's comments revealed she faced hostility from fellow jurors or, as defendant now suggests, she was "the lone holdout." See Ross, supra, 218 N.J. at 152. We reject such presumptions following examination of the facts of record.

Here, the trial judge sought the explanation for juror two's request to be excused. He directed the juror not to reveal juror interactions and deliberations. Jenkins, supra, 182 N.J. at 134 ("We cannot overemphasize the importance of maintaining the secrecy of jury deliberations . . . ."). After the inquiry, the judge explained the release of juror two: "I think she was pretty unequivocal that emotionally she cannot continue. I even got that sense from her voice. Her voice was cracking . . . ." This determination relied on not only the juror's verbal responses, identifying her emotional condition, but more importantly, was supported by observations of her physical demeanor, which revealed an obvious personal emotional condition, rendering her unable to continue.

Regardless of whether we believe the inquiry could have been more probing to more firmly establish the juror's specific

reasons confirming her request was personal to her, we respect the trial judge's ability to assess the juror's demeanor to discern whether the concern was evoked from interaction with fellow jurors or an individualistic reaction in reviewing the matter.  See Musa, supra, 222 N.J. at 565 ("The deference that must be accorded to trial court fact-findings in this setting must guide our analysis . . . .").

The trial judge was in the best position to make these determinations.  We conclude the trial judge properly carried out the delicate balancing function in exercising his reasoned judgment.  Indeed, he evaluated the testimony of two jurors, each seeking to be excused, and reached different conclusions based on their responses.  The judge gave particular attention to each juror's demeanor.  The conclusion that juror two suffered emotional distress making her unable to continue was based on the judge's evaluation of her statements and the judge's observations of her demeanor, which must be respected. Nothing in the record suggests juror two requested to be removed because of her interaction with other jurors or that she was a lone holdout.  As we discuss below, the record shows the jury was still evaluating evidence and had not progressed to a point where the determination of factual issues was reached.

We decline to conclude the judge abused his discretion in releasing juror two based on alternate possibilities developed in hindsight for the juror's expressed emotional condition, as advanced by defendant or the additional questions which could not have been posed to the juror as suggested by our dissenting colleague, see post (slip op. at 46). See Musa, supra, 222 N.J. at 572 ("Questioning, if not properly narrowed, had the potential to impermissibly infringe on the jury's deliberative process."); State v. Lipsky, 164 N.J. Super. 39, 44 (App. Div. 1978) ("[D]espite our disagreement with the judgmental decision of the trial judge, we cannot conclude that his failure to utilize better alternatives constitutes an abuse of the discretion vested in him in procedural matters of this kind."). Reversal is unwarranted. Goodman, supra, 415 N.J. Super. at 234-35.

We further conclude the deliberations had not proceeded to such an extent that declaring a mistrial was required. A mistrial is an extraordinary remedy used when necessary to prevent a manifest injustice. Id. at 234. The Court has also observed that granting a mistrial "imposes enormous costs on our judicial system," and the Court has noted its awareness that the prospect of a retrial after days or weeks of testimony creates a sense of futility. Jenkins, supra, 182 N.J. at 124.

In <u>Ross</u>, the Court rejected imposition of an "inflexible rule" to preclude substitution of a juror after deliberations had been conducted over a specific period of time. <u>Ross</u>, <u>supra</u>, 218 <u>N.J.</u> at 151. Instead, a trial judge, in his or her discretion, considers whether the jury appears to have progressed to the point where issues have been decided and deliberations cannot commence anew with a substituted juror. <u>Ibid.</u>

In this matter, although three days had elapsed from the time the case was submitted to the jury, deliberations had not been continuous. The jury submitted numerous requests to review evidence and hours of read-backs were performed in the presence of the jury and the alternates. No prior communications denoted the jury had decided any factual or legal issue. <u>Id.</u> at 152. Viewing all events and circumstances, we conclude the judge's determination the jurors were in the process of sifting through the evidence and deliberations had not gone so far that a reformulated jury would not be able to conduct open-minded dialogue to determine defendant's guilt or innocence was supported. <u>See</u> <u>Williams</u>, <u>supra</u>, 171 <u>N.J.</u> at 169 (stating read-back requests demonstrate uncertainty concerning guilt or innocence and did not prohibit substitution of jurors).

We further reject defendant's speculative inferences in support of a claim of prejudice, drawn from the shorter period of deliberations undertaken by the reconstituted jury. No prejudice or other basis requiring we set aside the judge's substitution of the excused juror is presented.

D.

Defendant next identifies five comments by the State during summation as unsupported by evidence. He asserts these improper statements amount to prosecutorial misconduct, the cumulative prejudice from which denied him a fair trial.

Following the State's closing, defendant objected to these five statements as unfounded: (1) suggesting Williams and Wigfall must have been the people who picked up the drugs from Fields' girlfriend; (2) stating Williams and Wigfall were gang members with defendant; (3) asking whether, after spending eighteen years in prison, Hayes really knew what gasoline smelled like; (4) assuming "women are better at colors than men" to explain why a male witness stated the Jeep was orange not red; and (5) asserting defendant was not arrested when stopped for a motor vehicle infraction while driving the Jeep after the crimes because the officer did not have a warrant. The State responded to each of these, providing the facts from which these reasonable inferences were drawn, and conceded the judge could

give an instruction addressing the comment about women's ability to identify colors.

Considering the arguments, the judge stated "looking at the five you mentioned, I don't think it warrants a curative instruction on any of them." He emphasized the jury instructions were replete with references that it is the jury's decision "as to what the facts [we]re not what counsel says" and "summations are not evidence, [they are] the recollection of the evidence by the attorneys." He also noted the overall instructions to the jury fully address their role and properly inform the jurors that summations include counsel's "comment" on what the State thinks was proven and what the defense thinks the State failed to prove.

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999). In determining whether comments in summation require reversal, an appellate court "must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." State v. Marshall, 123 N.J. 1, 153 (1991), cert. denied, 507 U.S. 929, 113 S. Ct. 1306, 122 L. Ed. 2d 694 (1993).

> Whether particular prosecutorial efforts can be tolerated as vigorous advocacy or must be

A-0492-11T4

> condemned as misconduct is often a difficult determination to make. In every instance, the performance must be evaluated in the context of the entire trial, the issues presented, and the general approaches employed.
>
> [State v. Negron, 355 N.J. Super. 556, 576 (App. Div. 2002).]

Where prosecutorial misconduct has occurred, to justify reversal, the misconduct must have been "so egregious that it deprived the defendant of a fair trial." Frost, supra, 158 N.J. at 83.

Judged by these standards and also considering the comprehensive jury instructions presented to the jury by the trial judge, we cannot agree these five comments caused prejudice or in any way diminished the fairness of defendant's trial. The prosecutor's explanation, responding to defendant's objection, tied testimonial evidence directly to support the statements to show they presented a reasonable inference from the facts of the record. McGuire, supra, 419 N.J. Super. at 140 (stating the prosecutor is granted "wide latitude to make 'fair comment' on the evidence") (quoting State v. Mayberry, 52 N.J. 413, 437 (1968), cert. denied, 393 U.S. 1043, 89 S. Ct. 673, 21 L. Ed. 2d 593 (1969)). The only exception was item four, the prosecutor's comment on color identification. The inclusion of this statement had little or no impact on the trial.

Mindful that remarks in summation must be measured in the context of both closings and the trial as a whole, State v. Johnson, 31 N.J. 489, 513 (1960), we find no error. See State v. Mahoney, 188 N.J. 359, 376-77 (holding prosecutor's comments were fairly based on the facts and reasonable inferences to be drawn therefrom), cert. denied, 549 U.S. 995, 127 S. Ct. 507, 166 L. Ed. 2d 368 (2006).

## E.

Defendant's final challenge lodges a discovery violation. He maintains the State failed to timely disclose a possible exculpatory witness, that is, a woman who had contacted police three weeks before trial stating defendant was with her at the time of the murders. During jury selection, defendant's mother called the judge's chambers advising that Detective Robert Morris of the Essex County Prosecutor's Office was given a statement from "Michele" who provided an alibi for defendant. Defendant had received similar information from his mother, but insisted the State failed to disclose an exculpatory witness.

In response to the defendant's application, the judge stated: "You're turning it on its head. Your client would have had this information" because it related to where he allegedly was during the crime. Defendant would have known had he been with the alibi witness. However, he never gave notice of an

alibi.  Also, the judge aptly noted this was a retrial and an alibi was never before raised.  For these reasons, we conclude the argument lacks sufficient merit to warrant additional discussion in our opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

**HIGBEE, J.A.D., dissenting.**

I respectfully disagree with the majority on several issues. The trial court excluded almost all of a defense expert's testimony describing the scientific research on voice identification, as well as the expert's opinions based on this research, for reasons that in some instances merely implicated the weight of the evidence, and in other instances were grounded in unprecedented and unsupportable precepts. The defense expert's testimony undermined the testimony of, perhaps, the most credible witness to identify defendant, albeit by voice. Precluding defendant from presenting the evidence arguably in and of itself denied defendant a fair trial; but there was more.

The trial court admitted all but one of the State's expert's opinions about street gangs, even though the prejudice to defendant — primarily demonstrating he was a high ranking leader of a dangerous gang — substantially outweighed the purported probative value of explaining other testimony. In addition, the trial court erred during the second trial by replacing a deliberating juror based on a limited and inadequate inquiry into the juror's reasons for wanting to be excused.

Any one of these errors had the clear capacity to affect the outcome of the trials. Cumulatively, they leave no reasonable doubt defendant was denied fair trials.

It is undisputed that four women were fatally shot in the head during a robbery and left to die in their burning apartment. The State accused defendant, Rolando Terrell, of perpetrating the robbery of two of the victims, the arson of their apartment, and the execution of all four women. The State's three key lay witnesses were two convicted felons who testified in exchange for sweetheart plea deals, and a young woman who survived the crimes by hiding in a closet. She identified defendant solely by his voice. Because my disagreement with the majority begins with the exclusion of expert testimony tending to undermine the voice identification, I begin with that issue and discuss in turn the two other issues on which I disagree with my colleagues.

I. EXCLUSION OF DEFENSE EXPERT'S TESTIMONY

My disagreement with the majority on this issue involves both the appropriate standard of review and the trial court's application of legal principles governing the admission of expert testimony. The majority cites State v. Kuropchak, 221 N.J. 368, 385-86 (2015), for the proposition that our review of a trial court's evidential rulings is deferential. Kuropchak involved neither the admission of scientific evidence nor appellate review of a trial court's decision to bar a defense expert's scientific opinions in a criminal trial.

In State v. Torres, 183 N.J. 554 (2005), the Supreme Court held a trial court's evidentiary rulings excluding defense expert testimony in criminal trials are reviewed under an abuse of discretion standard, but with less deference than in other settings. The Court explained that when reviewing the admission of scientific evidence, the appellate court must evaluate the reliability of the proffered scientific evidence, noting:

> While the trial court is in a better position to shape the record and make credibility determinations, "appellate courts can digest expert testimony as well as review scientific literature, judicial decisions, and other authorities." The appellate court should carefully review the relevant authorities in determining the correctness of the decision to admit or exclude the disputed testimony. In short, the appellate court need not be as deferential to the trial court's ruling on the admissibility of expert scientific evidence as it should be with the admissibility of other forms of evidence.
>
> [Torres, supra, 183 N.J. at 567 (citations omitted).]

There are other subtle variations in the standard of review of the admission of defense expert testimony in criminal cases. The admissibility of expert testimony is governed by N.J.R.E. 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to

> determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

There are three requirements for expert testimony to be admissible: "(1) the . . . subject matter [must be] beyond the ken of the average juror; (2) the field . . . must be at a state of the art [such] that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to . . . testi[fy]." State v. Townsend, 186 N.J. 473, 491 (2006) (quoting Torres, supra, 183 N.J. at 567-68).

Appellate review of the second prong has moved steadily closer to de novo review. "An appellate court may independently review scientific literature, judicial decisions, and other authorities to determine whether proposed expert testimony is scientifically reliable and has obtained general acceptance so that it may be admitted in our courts." State v. McGuire, 419 N.J. Super. 88, 123-24 (App. Div.) (citing Torres, supra, 183 N.J. at 567), certif. denied, 208 N.J. 335 (2011)). Although appellate courts continue to review a trial court's rulings on prongs one and three for abuse of discretion, our review of a trial court's exclusion of defense expert testimony in criminal cases requires consideration of "[N.J.R.E.] 702's liberal approach favoring admissibility." State v. Jenewicz, 193 N.J.

440, 456 (2008). With this in mind, the Supreme Court explained:

> That the strength of an individual's qualifications may be undermined through cross-examination is not a sound basis for precluding an expert from testifying as part of a defendant's defense, even if it likely will affect the weight that the jury will give the opinion. Rather, a court should simply be satisfied that the expert has a basis in knowledge, skill, education, training, or experience to be able to form an opinion that can aid the jury on a subject that is beyond its ken.
>
> [Id. at 455.]

Moreover, defendants in criminal cases have "a fundamental constitutional right to a fair trial, which necessarily includes the right to present witnesses and evidence in [their] own defense." Id. at 451 (citing Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923, 18 L. Ed. 2d 1019, 1023 (1967)). This "fundamental right . . . is protected not only by the Federal Constitution but also by Article 1, paragraph 1 of the New Jersey Constitution." Ibid. For this reason, "the substantial liberty interest at stake for [a] defendant" is a factor that must be considered by a trial court in exercising its discretion to admit or deny expert testimony. Id. at 456. Significantly, "[N.J.R.E.] 702's liberal approach favoring admissibility . . . and the substantial liberty interest at stake for defendant [may] tip the scales in favor of finding error in the trial

court's preclusion of [a defense expert's] testimony."  Ibid.
That should have been the result here.

The trial judge held a pretrial hearing under N.J.R.E. 104 to determine the admissibility of the opinions of defendant's expert, Dr. Steven Penrod.  The testimony elicited at the hearing disclosed the following information.  Dr. Penrod has a Bachelor's degree from Yale, a J.D. from Harvard University, and a Ph.D. in social psychology from Harvard.  After completing his education, Dr. Penrod served as an assistant and a full professor of psychology at the University of Wisconsin.  He then became a faculty member at the University of Minnesota School Of Law before becoming program director for joint degrees in psychology and law at the University of Nebraska.  At the time of the hearing, he held the title of distinguished professor in psychology at the John Jay College of Criminal Justice in New York City where he had worked since 2001.

Dr. Penrod described himself as a research psychologist. He testified his primary areas of research and study have focused on jury decision making and eye-witness identification. He has devoted much of his career to the study of law and psychology, specifically of memory encoding, recall, and identification by witnesses particularly in a criminal trial context.  As a result, Dr. Penrod has been qualified as an

expert and testified about memory formation and eye-witness recognition in various State and Federal courts well over 100 times. He testified he has also been qualified as an expert in voice identification cases approximately ten times in various courts, although voice identification is relevant in criminal trials considerably less often than eye-witness identification. In 2009, the Supreme Court appointed Judge Geoffrey Gaulkin, P.J.A.D., (retired and temporarily assigned on recall), as a Special Master to preside over a hearing on the reliability of eye-witnesses and prepare a report on his findings. Dr. Penrod was chosen as one of the experts to testify and offer his expert opinions at the hearing.

Within the scientific community that concentrates on the study of memory and witness identification, Dr. Penrod has been asked to speak and present his research papers at over 200 conferences involving psychologists from the United States and Europe. He authored or co-authored five books on eye-witness identification and published over 140 articles on jury decision making and witness identification. More than forty percent of his papers have been published in peer reviewed journals.

His research for the last thirty years, and continuing at the time of the hearing, was primarily funded by the National Science Foundation (NSF). He explained that only fifteen

percent of proposals submitted to the NSF are approved for grants yearly, and at the time of the hearing, his research was being funded by two separate NSF grants.

Dr. Penrod has done his own independent research and studies on jury decisions, memory, and eye-witness identification; however, he acknowledged he had not conducted his own experiments or studies on voice identification. He studied the research on voice identification, and included the topic in one of the first articles he wrote after graduating from Harvard. Dr. Penrod reviewed research on the subject from the 1930s and a published study from 1944. However, until the 1970s, there had been little research in that specific field. He testified a "new flourishing body of research" was undertaken by psychologists on voice identification starting in the 1970s. He admitted there was still a much smaller body of research limited to voice identification than was devoted to eye-witness identification. However, despite the smaller body of research, the investigations focused on the same factors and were "parallel streams of research."

The doctor explained that recalling and identifying a face or a voice a witness has seen or heard before relies on the ability to encode and then reconstruct the memory. According to Dr. Penrod, a memory is not, as is commonly believed by jurors,

A-0492-11T4

a photograph or a tape recording sitting in the brain waiting to be retrieved. Rather, memory involves piecemeal construction and reconstruction and is fallible. He testified that psychologists study the same factors affecting reliability of memory reconstruction and eye-witness identification as those studied on ear-witness identification. Dr. Penrod provided a list of more than twenty scientific research papers specifically about ear-witness identification. He particularly referenced the work of the leading researcher on the topic, a Canadian psychologist named Dan Yarmey, who has published over ten research papers specifically on witness voice identification.

Dr. Penrod testified the opinions he gave in his report were based on scientific research on both eye-witness testimony and ear-witness testimony that were generally accepted in the scientific community. He advised the court he would not comment on the witnesses or the specific facts, as he never opines on a particular witness's credibility. He explained he would simply testify about the science that could be applied by the jury to evaluate the evidence.[1]

---

[1] The prosecutor, on one hand, argued for exclusion because Dr. Penrod's testimony would not address the facts of the case, while arguing on the other hand his testimony would invade the province of the jury to determine credibility. The judge did not bar testimony based on either of these arguments.

Following the hearing, defendant argued Dr. Penrod was a qualified expert in the field of voice recognition and that his testimony would assist the jury in understanding and evaluating the ear-witness testimony.

The State did not call an expert to challenge the reliability of the science underlying Dr. Penrod's testimony; nor did it produce any evidence disputing the general acceptance by the scientific community of Dr. Penrod's opinions on face and voice identification. The State moved to exclude the testimony of Dr. Penrod, arguing he was not qualified as an expert to give testimony on voice recognition; that the testimony he proffered was not outside the ken of the average juror; that he did not give an opinion about the facts of the case; and the jury should determine credibility without assistance.

The trial judge issued a written opinion and order excluding almost all of Dr. Penrod's testimony. First, the judge acknowledged that although the evaluation of credibility of any witness was solely within the province of the jury, expert testimony in cases involving witness identification was admissible to demonstrate to the jury a witness may genuinely believe their identification is accurate even when it is incorrect. The trial judge stated:

> In cases where expert testimony has been admitted to elucidate witness statements, it was therefore

not to address whether the witness was giving truthful testimony, but rather to give the jury a "context in which to more realistically and fairly . . . appraise and consider the witness' perceptual accuracy." The trend is toward admitting such testimony after ensuring that it meets the rules for the admissibility of expert testimony.

[(Citations omitted).]

The trial judge proceeded to rule specifically on the admissibility of each separate topic presented in Dr. Penrod's report based on the criteria set forth in State v. Kelly, 97 N.J. 178, 208 (1984), stating:

(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.

In his analysis of the admissibility of evidence, the trial judge did not exclude any of the testimony based on the second prong of the three prong test. In fact, the prosecutor did not request exclusion of the testimony under prong two. Instead, the prosecutor and the trial judge — as does the majority - focused on an out-of-context quotation by the expert that he relied on "experimental" research. The prosecutor and trial court relied on this quotation when discussing the expert's qualifications to testify, thus seemingly implying the science was in doubt, but making no finding that the subject of voice

11

identification was not sufficiently accepted or reliable for admission. In fact, Dr. Penrod's testimony included a description of studies based on results from scientifically controlled experiments and other types of studies that gathered data from field observations or statistical databases. Dr. Penrod at one point differentiated other types of research from "experimental" research where experiments were actually conducted. At no time did he use the word "experimental" in the context of "unproven."

The following is a review of the rulings made by the trial judge on each of the reliability factors affecting ear-witness testimony as explained by Dr. Penrod.

A. STRESS

The testimony proffered by the expert on stress was based on studies showing that when an individual is under "flight or fight" stress, which is when they believe they are in immediate danger, their perception and ability to construct an accurate memory of a face or a voice is diminished. Their subsequent recall of that face or voice, and thus their identification of a defendant, is less reliable than if they were not under stress.

The judge barred Dr. Penrod from testifying on the effect of stress on the reliability of ear-witness testimony, thus significantly limiting the defendant's ability to challenge the

survivor's voice identification of defendant. The judge found the stress testimony was not within the ken of the average juror. Specifically, he found "information concerning stress and perception appears to be of potential help to the trier of fact in understanding the identification testimony of [the survivor]." The judge made a general finding that the field of study demonstrating stress diminishes the capacity for perception is "at such a state of the art that it can be reasonably relied upon." Indeed, Dr. Penrod testified at the hearing there is general acceptance within the scientific community of the studies affecting both eye-witnesses and ear-witnesses. The judge stated: "cases evaluating the admissibility of expert testimony considering 'ear-witness' identifications have drawn correlations to, or seen it as a subset of, expert testimony concerning eye witness testimony."

However, the judge barred the testimony on stress's effect on voice identifications holding "it appears that Dr. Penrod is therefore unqualified to testify concerning the effects of stress on voice recognition, and that such testimony would present a risk of misleading the jury." The judge reasoned Dr. Penrod was unqualified because he never conducted his own studies on voice identification. The State in their brief does not cite any precedential published case decided by any New

Jersey court that one must have conducted their own experiments or studies to be qualified as an expert witness. To the contrary, N.J.R.E. 702 states "a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." (Emphasis added). The rule does not require that an expert personally conduct experiments.

The trial court cites to one case from 1992 where a federal judge barred Dr. Penrod's testimony on stress and eye-witness testimony. In United States v. Nguyen, 793 F. Supp. 497, 515-16 (D.N.J. 1992), the federal district court judge found one of the reasons for barring his testimony was Dr. Penrod had not conducted his own experiments. Nguyen, which the State relied upon and which the trial judge discussed at length in his opinion, presents two legally unsupported and untenable assertions which fly in the face of legal precedent in this State and elsewhere.

The first is the assertion that not having done original research or experiments on a particular scientific topic is a basis for finding an expert is not qualified to give an opinion in that field. The second is the assertion that a subject is not outside the ken of the average juror if the jurors could read the scientific studies themselves, and understand them.

Both of those misguided assertions were repeated by the trial judge here as reasons to bar Dr. Penrod's testimony. Nguyen, however, does not reflect New Jersey controlling law in 1992 or in 2011, or the law in any other state. The trial judge here cited several other federal court decisions from the 1990's that admitted eye-witness expert testimony, including a 1991 decision by the Third Circuit that admitted the testimony of Dr. Penrod. See U.S. v. Stevens, 935 F. 2d 1380, 1397 (3d Cir. 1991)

The trial judge, again borrowing from the legally unsound reasoning of Nguyen, further held: "It is likely if the jury were provided documentation of the study, they would be able to come to the same conclusions . . . ." This reasoning is incompatible with our Rules of Evidence.

In 1991, the Supreme Court adopted the federal rule of evidence on the admission of learned treatises in Jacober v. St. Peter's Medical Ctr., 128 N.J. 475, 495 (1992). Before that decision, published textbooks, research papers or articles describing the current scientific knowledge in a field were not admissible except when used on cross-examination of a witness who acknowledged them as authoritative. In Jacober, the court adopted the federal evidence rule that allowed the admission into evidence of learned treatises. What prevents the jury from

considering as evidence any article published by anyone anywhere is the requirement that the treatise be vouched for by an expert on the stand.

As Justice Stein wrote: "Recently, we noted that in determining reliability '[t]he focus should be on what the experts in fact rely on, not on whether the court thinks they should so rely.'" Jacober, supra, 128 N.J. at 495-96 (quoting Ryan v. KDI Sylvan Pools, Inc., 121 N.J. 276, 289 (1990)). Thus, a jury can consider a learned treatise only when an expert can testify to its reliability, explain it, and be cross-examined about it. Justice Stein explained this principle as follows: "[t]he rule's emphasis on expert guidance, as well as its prohibition on the receipt of learned treatises as exhibits, limits the risk that factfinders will misunderstand or misapply learned-treatise statements and discourages the use of learned treatises as substitutes for expert testimony." Id. at 491.

Following the Jacober decision, N.J.R.E. 803 (18) was adopted and learned treatises were made an exception to the hearsay rule under the condition they be introduced by an expert on the stand and not be given directly to the jury. The Rule states:

> To the extent called to the attention of an
> expert witness upon cross-examination or relied
> upon by the expert in direct examination,
> statements contained in published treatises,

> periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by testimony or by judicial notice. <u>If admitted, the statements may not be received as exhibits</u> but may be read into evidence or, if graphics, shown to the jury.
>
> [<u>N.J.R.E.</u> 803(18) (emphasis added).]

The trial judge's statement that if the jurors were given the documentation they could come to the same conclusion as the expert as a reason to bar expert testimony is incomprehensible in light of <u>N.J.R.E.</u> 803(18)'s explicit preclusion of statements in learned treatises being received as exhibits. The question is, does the average juror know the information and the scientific acceptance of the information? The trial judge made the inconsistent finding that a distinguished expert in the field of witness identification did not know enough to explain the research, but the jury would somehow know and understand it if given the studies. Jurors not only cannot be given the studies, but are instructed to not use the internet or do their own research as they cannot consider studies that are not in evidence through the testimony of an expert.

A finding that Dr. Penrod was not qualified in the face of the evidence that was presented on his qualifications was as unsound as the court's statement the jurors themselves could

read and understand the studies. The ruling constituted a clear abuse of discretion.

B. WITNESS CONFIDENCE

The survivor testified she heard defendant speak only once before the date of the crime. She could not identify who he was by his voice when interviewed by police immediately after the crime. The next day she spoke to her boyfriend and she testified, while talking to him, she realized the voice she had heard was defendant's voice. She did not report this to the police until they called her to come into the station two days after the crime. At that point, the co-defendant had already identified defendant as the murderer to his friend, his brother, and the police. The police advised the survivor they had a suspect. The police did not provide her with a voice identification test similar to a line up or photo identification test. The witness identified defendant's voice only by her stated recollection. At trial she testified she was 100 percent certain about her identification of defendant.

Dr. Penrod would have testified that studies generally accepted by the scientific community demonstrate there was only a very modest correlation between the level of confidence asserted by a witness and the accuracy of their identification. Yet, research conducted by Dr. Penrod and others showed that

jurors are systematically influenced by the level of confidence the witness displays in their identification and do not understand how little that means in terms of accuracy of the identification.

The doctor further opined that the level of confidence of a witness is influenced by subsequent events unbeknownst to the witness. He explained even a response as slight as the researcher saying "good" when the identification was made would substantially increase the confidence of the witness. Other studies demonstrated that when the witness became aware the person they identified had been identified by someone else, their confidence in the identification was substantially increased.

The trial judge ruled he would allow testimony regarding witness confidence being only modestly correlated with the accuracy of an identification, but would not allow Dr. Penrod to testify that confidence was increased or decreased by feedback. The judge again discussed the decision in Nguyen pointing out that the federal judge had barred Dr. Penrod from giving any testimony about confidence and accuracy.

The trial judge explained: "Dr. Penrod's [proffered] testimony that subsequent events may effect a witness' confidence in her testimony is a matter of common sense, and is

not outside the knowledge of the average juror."  The evidence provides no support for this finding.

To the contrary Dr. Penrod testified:

> Well, there have been a number of surveys of the general public and what they believe about the influence of a variety of factors that have been the subject of research investigation, and whether they have the same understanding of these effects as research psychologists.
>
> The common pattern of findings is that some portion of the general public shares a belief that matches the research findings, but another substantial portion of the general public doesn't share that belief.

The average juror does not necessarily have any knowledge about the impact of even slight feedback.  The judge's decision to bar this testimony was arbitrary.  He did not examine the totality of Dr. Penrod's testimony and abused his discretion.

C.  LISTENERS' VIEW OF FACE

Dr. Penrod testified that there is an inherent level of unreliability in witness voice identification which is increased when a witness looks at the person while hearing their voice. He described studies where individuals listened to a voice and then had to identify the voice.  In the other arm of the studies, individuals saw a person's face as they spoke and then had to identify the voice.  The results demonstrated that when a person hears just a voice there is a better chance they will be

able to subsequently identify it than if they see the person and hear the voice simultaneously. The reason proffered by Dr. Penrod is that people focus more on faces than on voices, and therefore do not create as accurate a memory of the voice.

This is information the jury should have been allowed to hear because it could have assisted them in their evaluation of the identification of the defendant's voice by the survivor. The one time she heard defendant speak before the crime was committed, she was simultaneously looking at him. She next heard his voice on the night of the crime. It was from her memory of the prior occasion that she was able to identify his voice. According to the research, the reliability of her memory could be affected if the memory of his voice was developed while viewing defendant.[2]

The judge again used the language and reasoning of the district court judge in Nguyen to bar Dr. Penrod's testimony, finding he was not qualified to testify as an expert because he

---

[2] The record does not reflect whether the survivor was looking at defendant's face when he spoke because this area of testimony became irrelevant when the expert's testimony was barred. It most certainly would have been probed during her examination if the expert's testimony was not already barred. Then, depending on her testimony, Dr. Penrod could have been cross-examined on the reliability of the research. If the testimony established the survivor did not see defendant's face as he spoke, the State could have moved to bar this area of testimony. Significantly, this was not part of the trial court's reasoning for barring the testimony.

A-0492-11T4

relied upon the studies of other researchers, did not provide his own analysis, and provided only a "minimal recitation of the facts and processes underlying the research." The judge also noted, "if the jury were provided documentation of the study, they would be able to come to the same conclusions." The indisputable error in that statement has already been discussed. Such a misunderstanding and misstatement clearly constitutes an abuse of discretion. See Moraes v. Wesler, 439 N.J. Super. 375, 378 (App. Div. 2015) (noting abuse of discretion arises when, among other things, a decision impermissibly departs from established policies, rests on an impermissible basis, or is based upon consideration of irrelevant or inappropriate factors).

D. UNCONSCIOUS TRANSFERENCE

Dr. Penrod testified that sometimes a witness is influenced to identify the wrong perpetrator when they have some limited prior exposure to that person. He described several studies including one where researchers staged thefts both in classroom and in street settings. Witnesses were asked to identify the thief. Twenty-five percent of witnesses wrongly identified an innocent bystander, unconsciously transferring a face they had some memory of to the perpetrator. The jury should have been

permitted to consider unconscious transference in evaluating the reliability of the witness identification.

The studies described by Dr. Penrod on this topic did not include specific studies of voice identification versus eye-witness identification. However, the judge did not find his opinions on voice identification were unscientific. Rather, he again barred the testimony finding it could be misleading because Dr. Penrod did not do his own studies or "apply his own analysis or expertise to it." He also found the jury "would be able to come to the same conclusions" if they were given the studies to read. Barring this testimony on that basis, which has no foundation in the law, was an abuse of discretion.

E. DURATION OF EXPOSURE TO VOICE

Dr. Penrod testified at the hearing that studies show the longer a witness is exposed to a voice, the more accurate the witness identification of the voice. The trial court barred expert testimony on both factors.

As to the proffer that the longer the exposure the more accurate the identification, the trial judge barred the testimony and found this was common sense and within the ken of the average juror. The judge was correct on that limited finding. The expert, however, was actually proffering this testimony to explain the common understanding that duration of

exposure is equated to accuracy is only true "if all other [factors] are equal." Dr. Penrod referenced a study conducted on military personnel who were interrogated for forty minutes face-to-face in both high stress and low stress situations. The effect of very high stress was of such significance that even though the interrogation was of long duration the accuracy rate of subsequent identifications was only twenty-seven percent.

Dr. Penrod also used the concept of duration of time to explain that although studies show that longer time exposure improved accuracy, if the exposure was broken up in several episodes, the observer would have better recall. For example, if one hears a voice for a period of time, then there is a break in time, and then exposure begins again, the witness will usually have more accurate recall than if the exposure to the voice was for the same length of time but was continuous. Thus, Dr. Penrod had more to offer to the jury than the isolated concept that the longer one is exposed to a voice, the more accurate the identification. For this reason, the judge's finding, which did not address the entirety of what was being proffered and took Dr. Penrod's testimony out-of-context, was made arbitrarily and was an abuse of discretion.

A-0492-11T4

F.  TIME ESTIMATIONS

The doctor's second opinion about time of exposure concerned the overestimation by test subjects of the length of time of non-routine brief events.  A witness's description of how long a period of time an event lasted, and thus how long they were exposed to a persons' voice or face, according to Dr. Penrod, is almost always overestimated by a significant amount when the event is brief and not routine.  Researchers found witness time estimates are significantly more accurate for longer events than shorter events.  The trial judge barred this testimony because it was within the ken of the average juror, but offered no support for this holding.  Some jurors may believe it to be true and others may not, but few, if any, jurors will have read the scientific literature and know what studies have demonstrated.  Nor could they use them in the jury room without expert testimony.

The judge, in barring this testimony and several of the factors that follow, also held that the accuracy of the witness's testimony could be tested based on the witness's demeanor and through cross-examination.  This finding by the court demonstrates a lack of comprehension of the entire purpose of allowing expert testimony on witness identification. Normally jurors can evaluate credibility because deciding

A-0492-11T4

whether someone is telling the truth is a skill learned through experience. The problem with witness identification is it can be mistaken for reasons explained by Dr. Penrod, even in the absence of a motive to lie that can be revealed on cross-examination. The witness may be an honest person with good intentions who sincerely but mistakenly believes they are telling the truth. The witness's demeanor will be that of a truth teller if they believe they are being truthful.

Finally, the judge again found the expert just recited the findings of others as opposed to doing original research, and that the jury could read and understand the studies themselves. These reasons are unsupported by the law and demonstrate an abuse of discretion.

G. CHANGES IN SPEAKER'S TONE

Dr. Penrod testified another factor that affects voice recognition is whether the speaker's tone of voice is the same. He described a Canadian study where individuals were played a recording of a speaker talking in a normal non-emotional voice and subsequently were asked to identify that voice from other voice recordings, including the original speaker speaking in very emotional tones. Here, the survivor first heard defendant's voice in a conversation while sitting in a truck, then two weeks later at the crime scene where the speaker was

shouting and threatening in an angry voice.  The effect a change of tone can have on the reliability of an identification could be helpful to the jury in evaluating reliability.

The trial judge barred it, however, because he found it was within the ken of the average juror that hearing a voice in a different tone would make it more difficult to identify.  What the judge ignored is that the study described by the expert demonstrated statistically that subjects in the study who heard a voice in a different tone were no more statistically likely to identify the right voice than would have occurred by chance, or in other words, just guessing.  While a juror might assume through common sense that a change in tone might affect the accuracy of a voice identification, the experiments and the research demonstrate that tone of voice is very significant in terms of recollection.  The trial judge did not look at the totality of the information Dr. Penrod proffered.  The barring of testimony applying this limited examination of the proffered testimony was an abuse of discretion.

H.  COMPETING VOICES

Dr. Penrod's proffered testimony on competing voices was that the reliability of voice identification is diminished when there are other voices and sounds heard at the same time.  He offered no additional information.  The trial judge barred the

27                                      A-0492-11T4

testimony because he found this is common sense. There was no error in this ruling.

I. RETENTION INTERVAL

The trial judge found Dr. Penrod's testimony on the effect of the duration of time between hearing the voice and the identification of the voice was not beyond the ken of the average juror, and he barred it as falling within the realm of common sense. The trial judge oversimplified Dr. Penrod's testimony by describing it as simply an opinion that the longer the time period between the identification and the crime, the less accurate the identification.

In fact, there are two time periods in this case possibly affecting the reliability of the identification. First, the survivor heard defendant's voice two weeks before she heard it during the crime. Second, there was a different period of time following the crime before she was able to identify the voice as defendant's. The studies Dr. Penrod described in his testimony relate to how the duration of time between first hearing a voice, and then hearing it a second time, impacts the accuracy of the identification. Although the average juror would have a common sense understanding that the longer the time gap, the less accurate the identification will be, Dr. Penrod proffered more scientific information that is not common sense and does

fall outside the ken of the average juror. Dr. Penrod testified:

> [M]ost people do recognize that, with the passage of time, we lose information. What people typically will not understand, and what the research shows — and, indeed this is research dating back to the 1880s with regard to memory — is that the loss of memory is most rapid in the first few hours and then days following an event.

Dr. Penrod testified that he, along with other colleagues, have done a meta-analysis of the research on loss of face memory, which demonstrated that the most rapid loss of memory occurred in the first ten hours. Specifically, in voice recognition studies, he testified other researchers found between a nineteen and sixty-nine percent accuracy in identifying a voice after two weeks. This is not information within the ken of the average juror, and it was an abuse of discretion to bar the testimony on this basis.

J.  VOICE VERSUS FACE RECOGNITION

The trial judge barred Dr. Penrod's testimony that voice identification is substantially less accurate than face identification, i.e., eye-witness versus ear-witness. The judge again found this was common sense and not beyond the ken of the average juror. The fact that it is easier to identify a face than a voice may not be common knowledge. Dr. Penrod's testimony went beyond the general knowledge the average juror

29

might have as to the level of accuracy of voice identification. The research demonstrates, according to Dr. Penrod, "dramatically worse" results for voice recognition. He discussed the specific differences and study results in his pretrial testimony. It was an abuse of discretion to bar all of his testimony because of a finding the average juror may have some information based on his or her own experience, without recognizing the average juror is unlikely to know the accepted scientific research that puts the juror's general understanding in the context of the magnitude of difficulties in voice recognition.

   K.  WITNESS IDENTIFICATION GENERALLY

   Dr. Penrod proffered testimony about a body of research that shows witness identification by both eye-witnesses and ear-witnesses is much more unreliable than the average juror would expect. The three Kelly criteria were met by this proffer, but the trial judge barred the testimony finding inexplicably this could be explored on cross-examination. I disagree.

   There is no lay witness that can be cross-examined about the research that has found the reliability of witness identifications to be problematic. The judge's determination this was within the ken of the average juror is not supported by the studies relied on by the expert. According to Dr. Penrod,

the research demonstrates that jurors have mixed understandings about the reliability of witness identification and the factors that affect it. The trial judge barred this area of testimony because he found that "while courts have allowed testimony concerning special factors affecting identification accuracy, it does not appear that courts have admitted testimony concerning the general reliability or unreliability of eye-witness identifications." It is understandable that this lack of prior precedent would cause a trial judge to pause and consider the reason for the same. However, evidence cannot be excluded because it has not been found admissible in prior cases. As we explained in State v. Burr, 392 N.J. Super. 538, 557 (App. Div. 2007), aff'd as modified, 195 N.J. 119 (2008):

> Our court rules allow the admission of "all relevant evidence" that is not otherwise excluded by law. Relevant evidence is defined as any evidence that has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." In determining whether proffered evidence is relevant, the trial court should inquire as to whether a "logical connection" exists between the evidence and a fact in issue. Stated another way, if the evidence renders a desired inference more probable or logical, then the evidence should be admitted. The test for relevancy is a broad one that generally favors admissibility.
>
> [(Citations omitted).]

Considering this standard for admissibility of relevant evidence, it was an abuse of discretion to preclude Dr. Penrod's testimony about studies on the general lack of reliability of witness identification. Dr. Penrod could be cross-examined by the State about any flaws in the studies themselves, his reasoning, and the applicability of eye-witness studies to voice identification.

L. RECONSIDERATION BY THE COURT

After the judge ruled on the admissibility of Dr. Penrod's testimony, the Special Master's Study ordered by the Supreme Court was completed and released. Defendant made a motion for reconsideration on the admission of Dr. Penrod's testimony. The trial judge denied the motion, and stood by his prior decisions, except for one.

The judge addressed in some detail two specific areas discussed in the report. The Special Master found that jurors tend to underestimate the importance of memory decay. The trial judge acknowledged this contradicted his prior finding that this area of testimony was within the ken of the average juror. Nonetheless, he ruled it was barred as being common sense, based on one statement, taken out-of-context, where Dr. Penrod said the general principle was common sense. The judge overlooked the balance of the expert's testimony.

A-0492-11T4

The second area the judge addressed was defendant's argument that because the witness was told by the police they had a suspect before she identified defendant, this might have tainted the identification. The judge applied the same flawed criteria he relied upon to bar other testimony, namely, he would only consider allowing the testimony into evidence if Dr. Penrod had conducted his own study on this factor.[3] Defense counsel did not contend Dr. Penrod performed such a study.

In view of the trial judge's rulings — which eviscerated the expert's opinion — defendant did not call the expert as a trial witness to testify about two factors: (1) the effect of stress on eye-witness testimony, not including the effect of stress on voice identification or the crossover between the studies; and (2) studies showing a witness's confidence level and the accuracy of his or her identification are not correlated, not including the studies showing how outside factors can affect the witness' confidence level. The majority faults defendant for not presenting his expert's eviscerated opinion, stating: "On appeal, defendant claims 'the limited nature of testimony that he would be permitted under the Court's ruling' neutralized its effectiveness. We disagree." Our

---

[3] The judge pointed out another psychologist had testified on this factor before the Special Master and not Dr. Penrod.

agreement or disagreement with defendant's decision is irrelevant. The question is whether defendant was deprived of "a fundamental constitutional right to a fair trial, which necessarily includes the right to present witnesses and evidence in his own defense." Jenewicz, supra, 193 N.J. at 451. "[N.J.R.E.] 702's liberal approach favoring admissibility . . . and the substantial liberty interest at stake for defendant [may] tip the scales in favor of finding error in the trial court's preclusion of [a defense expert's] testimony." Id. at 456. Here, the trial judge not only overlooked these considerations, he barred defendant from presenting evidence in his own defense based on unsupported assumptions and a misunderstanding of the rules of evidence.

The law in the area of witness identification is still developing. The Supreme Court's decision in State v. Henderson, 208 N.J. 208 (2009),[4] is not retroactive, but the evidence that was wrongfully barred in this case was admissible under our case law at the time of the trial. The trial court's rulings barring testimony of Dr. Penrod should be reversed for the reasons and with the exceptions set forth above.

---

[4] Dr. Penrod's testimony before the Special Master and his published work were quoted at length in the decision, which focused on eye-witness identification.

## II. ADMISSION OF TESTIMONY BY STATE'S GANG EXPERT

The trial judge allowed the State to call Lieutenant Earl Grave as an expert on gangs. Lieutenant Graves works for the Essex County Prosecutor's Office. Defendant argues that while Lieutenant Graves' testimony may have been otherwise admissible, it should have been barred under N.J.R.E. 404(b), which states:

> Except as otherwise provided by Rule 608(b) evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

It is accepted that even when the jurors are instructed that prior crimes or bad acts are being admitted into evidence for reasons other than demonstrating defendant's propensity to engage in criminal activity, such evidence is uniquely prejudicial and inflammatory. The Supreme Court recognized this as we acknowledged in State v Hernandez, 334 N.J. Super. 264, 269-70 (2000), aff'd as modified, 170 N.J. 106 (2001):

> Because of the "widespread agreement that other-crimes evidence has a unique tendency to turn a jury against the defendant . . . ," State v. Stevens, 115 N.J. 289, 302 (1989), the compromise between the antagonistic interests that the Rule seeks to effect can be achieved only by the most delicate balancing. As Stevens, supra, at 303, explains, "[i]t is this inflammatory

characteristic of other-crimes evidence that mandates a careful and pragmatic evaluation by trial courts, based on the specific context in which the evidence is offered, to determine whether the probative worth of the evidence outweighs its potential for undue prejudice." The tension between undue prejudice to the defendant and probative value to the State to prove a fact legitimately in issue induced the Supreme Court in State v. Cofield, 127 N.J. 328, 338 (1992), to articulate further the conditions of admissibility of other-crimes evidence, the Court defining those conditions as follows:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[(Alteration in original).]

Defendant argued under the first and last Cofield prongs the admission of the prosecution's gang expert's testimony in both trials was error. Lieutenant Graves' testimony was of little or no probative value, and had such a strong potential for prejudice it should have been excluded.

The State argues the testimony by the gang expert was admissible as relevant to several material issues in dispute.

36                                                                    A-0492-11T4

A. "GIRLFRIEND" AS GUN

Defendant was intercepted on a wiretap telling a man he was coming by the next day to pick up his "girlfriend." The man testified for the State that he had a gun belonging to defendant and the gun was the "girlfriend." He further testified he returned the gun to defendant the day before the murder. One reason the State gave for calling the gang expert was to explain that on the street, "girlfriend" means gun. This could have been explained without a reference to gangs. Instead, Lieutenant Graves was asked:

> Prosecutor: In your experience, have blood gang members, or gang members in general, used coded words to, I guess, hide their activities?
>
> Expert: Absolutely, code words.
>
>     . . . .
>
> Prosecutor: How about the weapons? Do they use any code words to hide the meaning of a handgun or any weapon?
>
> Expert: Yes.
>
> Prosecutor: What code words or phrases do they use?
>
> Expert: Girlfriend or wifey.
>
>     . . . .
>
> Prosecutor: And what is the purpose of using these coded words?

37

>Expert: To, uh, conceal it from law enforcement, or just hide it.

These references to illegal gang activity were unnecessary and had limited probative value. The jury heard the tape. The same testimony offered by the expert about slang used for guns came in from the man who had the gun. No one on the jury had any reason to think defendant had left his actual girlfriend with the man for days and wanted to pick her up.

## B. USE OF JEEP

Lieutenant Graves testified that a lower ranking gang member had to lend his personal property to a higher ranking member of the gang:

>Prosecutor: What about personal property within the gang? How is that shared or used?
>
>Expert: It's shared with other members, and, of course, the higher you are up the food chain, the hierarchy, the more power you would have and influence and use of whatever you want, just as — — I'm a captain. If I want something, you know, I'll use something one of my — — one of my lieutenants or detectives have, I'll just tell them to give it to me, order 'em.

Because the red Jeep that was identified as being driven to and from the crime by defendant was not owned by defendant, the State asserts the expert testimony was needed to show why defendant had use of the Jeep, even though the expert did not mention the Jeep directly. However, there was testimony by

38

other witnesses that defendant was seen driving the Jeep on other occasions, and that it was owned by a man who let him use it. There was no need to show this was because of gang ties. Additionally, there was testimony that the police had stopped defendant for traffic violations while in the Jeep. There was no dispute defendant frequently drove the Jeep. The gang expert testimony had little or no probative value because defendant's use of the Jeep was available and given by other witnesses and not even directly addressed by the expert. Under these circumstances, the references by the gang expert did little more than remind the jury defendant was a high ranking gang member.

C. OPPORTUNITY

The victim, who defendant was convicted of robbing in the first trial and murdering in the second, was the girlfriend of a man in jail. The boyfriend and victim were drug dealers. The co-defendant testified defendant told him he was going to rob the victim and it would be easy. The State established through testimony that defendant had been to the victims' home before the murder. The State claims the gang expert was called to explain that defendant had the opportunity to gain entry into the residence. The State asserts that since defendant was a higher ranking gang member than the victim's boyfriend, the victim, who was not a gang member, had to admit defendant into

her home. The gang expert never gave this proffered testimony and it would have been unnecessary as there was other testimony defendant was allowed in the home and knew the victim's boyfriend was in jail.

D. TATOOS

Lastly, the State asserts the gang expert's testimony about gang tattoos had probative value. The co-defendant testified defendant showed him a tattoo on his neck after the crime, telling the co-defendant that he did not need any "co-defendants." The co-defendant testified he knew defendant was a gang member after seeing the tattoo. He also testified seeing the tattoo made him nervous because he knew the defendant's gang was vicious, and he feared for his family's safety. It was unnecessary, therefore, for the gang expert to explain that gang members had tattoos to identify them as part of a gang. Defendant presented no evidence he was not part of a gang or the tattoo was not a gang symbol.

The gang expert testimony simply repeated facts already established by the lay witnesses. The probative value was limited or non-existent. The prejudice, however, was significant because the gang expert testimony was not limited by the judge to the testimony the State claims was relevant.

A-0492-11T4

E. PREJUDICIAL EFFECT

The error in the admission of expert testimony is that it included prejudicial testimony of defendant's involvement with the "Bloods" and specifically included Lieutenant Graves' history and habits of the Bloods. This history included references to the Bloods' feud with the Crips, which had no relevance to the crime. This testimony was followed by the expert's identification of defendant as a top leader of the Bloods gang, or as he described it, an original gangster or founder of the gang. These gang names are well known, and the public perception is that people who belong to these groups are bad people with a propensity to commit crimes. Even if any of the jury had not heard of the Bloods before the trial, they knew about their involvement with law enforcement by the trial's end; a fact relevant to no material issue in dispute. Defendant's gang membership would have come before the jury, but not with the same impact as when a member of law enforcement testifies about the gang, its history, its hierarchy, and law enforcement's prior focus on and encounters with gang members.

The probative value of the references to defendant's gang ties were substantially outweighed by its undue prejudice. See N.J.R.E. 403 ("evidence may be excluded if its probative value is substantially outweighed by the risk of [] undue prejudice").

Gang references are admissible only if N.J.R.E. 404(b) is satisfied. "Other crimes evidence is considered highly prejudicial." State v. Vallejo, 198 N.J. 122, 133 (2009). "The prejudice of other-crime evidence is its tendency to demonstrate a criminal predisposition; therefore, it poses a distinct risk that it will distract a jury from an independent consideration of the evidence that bears directly on guilt itself." State v. G.S., 145 N.J. 460, 468 (1996). An individual may not be convicted merely for belonging to an organization that advocates crime. Scales v. United States, 367 U.S. 203, 220-21, 81 S. Ct. 1469, 1481-82, 6 L. Ed. 2d 782, 796, reh'q denied. 366 U.S. 978, 81 S. Ct. 1912, 6 L. Ed. 2d 1267 (1961).

### III. REPLACEMENT OF A DELIBERATING JUROR

After deliberations commenced in the retrial, two jurors requested to be excused. Defendant contends the judge's inquiry and conclusory findings were flawed, and replacement of one juror, over defendant's objection, rather than declaring a mistrial, was error.

A court's substitution of an alternate juror is limited by Rule 1:8-2(d)(1), which provides in relevant part:

> Following the drawing of the names of jurors to determine the issues, the court may in its discretion order that the alternate jurors not be discharged, in which event the alternate jurors shall be sequestered apart from the other jurors and shall be subject to the same orders and

42

instructions of the court, with respect to sequestration and other matters, as the other jurors. If the alternate jurors are not discharged and if at any time after submission of the case to the jury, a juror dies or is discharged by the court because of illness or other inability to continue, the court may direct the clerk to draw the name of an alternate juror to take the place of the juror who is deceased or discharged. When such a substitution of an alternate juror is made, the court shall instruct the jury to recommence deliberations and shall give the jury such other supplemental instructions as may be appropriate.

We review a trial court's decision to substitute an alternate juror for an abuse of discretion. State v. Musa, 222 N.J. 554, 564-65 (2015). We are guided by certain principles in applying this standard; Rule 1:8-2(d)(1) "delicately balances two important goals: judicial economy and the right to a fair jury trial." State v. Jenkins, 182 N.J. 112, 124 (2004). The Supreme Court has explained that juror substitution should only be invoked as a last resort because it "poses a clear potential for prejudicing the integrity of the deliberation process." State v. Hightower, 146 N.J. 239, 254 (1996). With this in mind, "[t]he court must be prepared to declare a mistrial if a substitution would imperil the integrity of the jury's process." State v. Ross, 218 N.J. 130, 147 (2014). In making its decision, "the trial court must determine the cause of the juror's concern and assess the impact of the juror's departure on the deliberative process." Ibid. Additionally, the court

"must ascertain whether a reconstituted jury will be in a position to conduct open-minded and fair deliberations." <u>Ibid.</u>

Here, the trial judge was confronted with the difficult task of learning the source of the juror's distress without asking a question that might elicit information about the jury's deliberations. To avoid such disclosure, "[j]udges must caution a juror at the outset of the colloquy that she must not reveal the way in which any juror plans to vote, or the vote tally on a verdict." <u>Jenkins</u>, <u>supra</u>, 182 <u>N.J.</u> at 134.

The Supreme Court has "restrictively interpreted the phrase 'inability to continue' in <u>Rule</u> 1:8-2(d)(1) to protect a defendant's right to a fair jury trial, forbidding juror substitution when a deliberating juror's removal is in any way related to the deliberative process." <u>Jenkins</u>, <u>supra</u>, 182 <u>N.J.</u> at 124. "A deliberating juror may not be discharged and replaced with an alternate unless the record 'adequately establish[es] that the juror suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members.'" <u>Id.</u> at 124-25 (quoting <u>Hightower</u>, <u>supra</u>, 146 <u>N.J.</u> at 254).

In <u>Jenkins</u>, the Supreme Court strongly emphasized the importance of not removing a juror because of inter-juror conflict:

A juror cannot be removed merely because she is taking a position at odds with other juror's views. A juror has the unassailable right to see the evidence in her own way and to reach her own conclusions, regardless of how overwhelming the evidence or how illogical her view may appear to other jurors. "If a court suspects that the problems with the juror are due to interactions with other jurors, the court should instruct the jury to resume deliberations."

[Id. at 125 (citations omitted).]

We review what the judge did in this case in light of the controlling law. Here, jurors two and six asked to be excused via a note sent to the court. The judge interviewed juror two who was described as clearly upset and emotional. The judge described the juror's voice as cracking.

The judge first told juror two she could not discuss the deliberations. This was appropriate, but the interview itself was extremely short consisting of only three questions to which the juror gave conflicting answers. Most importantly, the juror was never asked to explain her reason for being upset. The judge was required to ascertain why the juror was upset and asking to be removed from the jury. He never achieved this goal and made very little effort to get the information he needed. His finding she was upset and emotional is undoubtedly true. However, if her reasons for being upset were personal, she could be removed and replaced, but if she was upset because of how deliberations were going or because of interactions with other

A-0492-11T4

jurors during deliberations, she either had to continue or the court was obligated to declare a mistrial. That decision could not be made without information about the cause of her distress.

The colloquy between the court and the juror follows:

> THE COURT: Do you feel that there is emotionally an inability for you to proceed and perform your duties as a deliberating juror?
>
> THE JUROR: Yes.
>
> THE COURT: Do you feel that these emotions that you have, again, would impact upon your ability to perform your function in this case?
>
> THE JUROR: No. I know it's not balanced in what I'm saying, but there's [sic] reasons why I can't speak without giving away —
>
> THE COURT: I don't want you to talk about that. But emotionally, you feel you can't continue?
>
> THE JUROR: Correct.
>
> THE COURT: I'm going to leave it at that for now. Thank you.

It is difficult to reconcile that limited exchange with the majority's conclusion that "the trial judge sought the explanation for juror two's request to be excused." Ante at 55. The judge appears to have avoided eliciting an explanation that could require a mistrial, at the cost of wrongfully replacing a juror. The juror never said she could not be fair to both sides. In her limited response to question two, the juror

46

denied that was the situation, but was prevented from giving an explanation. She agreed in response to question one and three that she did not feel she could continue with the deliberations but gave no explanation as to why.

The majority opinion states:

> He [defendant] additionally infers from juror two's comments she was at odds with other jurors, a circumstance not justifying excusal. See []Jenkins, [supra,] 182 N.J. [at] 124-25 [] (holding excusing a juror cannot be based on juror interaction with other jurors). We cannot agree the juror's comments revealed she faced hostility from fellow jurors . . . .

[Ante at 54-55.]

We do not know, based on this record, if the juror was upset because she was at odds with other jurors since the juror was never given the opportunity to reveal the reason for her distress. Moreover, her assertion that "there's [sic] reasons why I can't speak without giving away —" does reasonably imply that she needs to discuss her emotional state in the context of something relating to jury deliberations, which was the only thing she was instructed not to mention. The trial judge discharged juror two on a record that did not adequately establish her inability to function.

The trial court's inquiry was insufficient to determine the cause of the juror's unwillingness to continue deliberations.

47

The juror started a statement that gave the trial court reason to suspect the juror's problem was due to interactions with other jurors, but he stopped her before she could complete her answer. Even if there is some other way to interpret the juror's statement, the trial record does not adequately establish the juror suffered from an inability to function personal to her and unrelated to her interaction with other jury members.

Although it is clear the trial court's effort was designed to preserve the verdict and "avoid the deplorable waste of time, effort, money, and judicial resources inherent in a mistrial," Hightower, supra, 146 N.J. at 254, the cause of juror two's emotional distress could have been attributable to either personal problems or her interaction with other jurors. The record does not adequately establish the cause. For that reason, it is necessary to conclude the trial court misapplied its discretion by replacing juror number two.[5]

IV.

Our Supreme Court has explained the doctrine of cumulative error: "the rule is that where any one of several errors

---

[5] The judge could have simply sent the jury home for the day to allow the juror to calm down or could have asked whether her reasons were related to other juror's interactions with her, after telling her to limit her initial response to yes or no.

assigned would not in itself be sufficient to warrant a reversal, yet if all of them taken together justify the conclusion that defendant was not accorded a fair trial, it becomes the duty of this court to reverse." State v. Orecchio, 16 N.J. 125, 134 (1954) (quoting State v. Dolliver, 184 N.W. 849 (Minn. 1921)). Here, the trial court excluded relevant and potentially exculpatory testimony, admitted mostly irrelevant testimony about gangs, and improperly excused a deliberating juror. In my view, each of these errors deprived defendant of a fair trial. Their cumulative effect clearly did so. For the reasons set forth above, I would reverse the convictions in both trials and remand for a new trial on all remaining charges.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION